47 N.J. Super. 48 (1957)
135 A.2d 243
KEEVIC FARBER AND MAE FARBER, PLAINTIFFS-RESPONDENTS,
v.
SHELL OIL COMPANY, A CORPORATION OF DELAWARE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 1957.
Decided October 14, 1957.
*50 Before Judges CLAPP, JAYNE and HUGHES.
Mr. Francis E.P. McCarter argued the cause for appellant (Messrs. McCarter, English & Studer, attorneys).
Mr. Harold D. Feuerstein argued the cause for respondents (Mr. Irving I. Wittes, attorney).
The opinion of the court was delivered by HUGHES, J.S.C.
We consider here an appeal from a judgment entered in the Chancery Division (in the formal litigation frame of a suit for an accounting of rent) dealing with the construction of a contract deemed by it, in law, to be ambiguous of meaning, and determining, as trier of the fact, a pattern of surrounding circumstance requiring the interpretation reached by that court. Not only these legal and factual findings, but also the bulk of evidence rulings made at the trial, are the targets of this appellate challenge.
The defendant-appellant, Shell Oil Company, a Delaware corporation, to be referred to for brevity as "Shell," was lessee, and the plaintiffs-respondents, husband and wife, were lessors, of a certain lot owned by them on the corner of Springfield and Morris Avenues in Springfield, Union County, New Jersey. With deference to Mrs. Farber but for the purpose of brevity, we shall refer to this domestic unit as "Farber." The premises involved adjoined other land owned by Farber, on which the latter operated a lumber yard. In February of 1950 the parties entered into a lease whereby Shell rented this corner from Farber, to be used by it as a gasoline station, and this leasehold was for a *51 five-year term to commence on June 1, 1950. The clause reserving the rent under the lease is of such significance to the controversy that it is reproduced in full:
"Second. Shell shall pay, as rent for the leased premises for each calendar month during the term of this lease, in cash to, or by check to the order of Keevic Farber: (a) the sum of Two Hundred and Five Dollars ($205.00) on or before the fifteenth day of such month; and (b) an additional sum equal to one and one-half cents (1 1/2¢) for each gallon, if any, in excess of thirteen thousand (13,000) gallons of gasoline sold on said premises during such month, as shown by Shell's records, payable on or before the fifteenth day of the following calendar month. Rent accruing under the preceding clause (a), for any period less than a calendar month shall be prorated on a per diem basis."
The conjoining of the "overriding gallonage" stipulation, as sometimes it is called, to the fixed amount of monthly rental, is not uncommon in such leases nor in subleases whereby a corporate lessee such as Shell arranges for the actual operation of the station by another. (Such a sublease of the instant property by Shell to another was in evidence here.) In 1953 the parties entered into an agreement extending the term of such lease for a period of two years from June 1, 1955, providing relevantly as follows:
"* * * shall be and the same hereby are extended for a period of Two (2) years, beginning on the 1st day of June, 1955, and ending on the 31st day of May, 1957, upon the same terms and conditions as set forth in said lease (as heretofore amended) except that, (1) during such extended period, Shell shall pay rent at the rate of Two Hundred and Thirty Dollars ($230.00) per month and, (2) Lessor shall have the right at lessor's option to terminate this extension at any time by giving Shell at least thirty (30) days' notice provided that, Lessor pays to Shell, as consideration therefor a sum equal to the cost to Shell of the improvements, to be completed by Shell prior to March 1, 1953 and not to exceed Eighteen Hundred Dollars ($1800.00) less a deduction therefrom for depreciation computed at the rate of two per cent per month on said amount from the month of March 1953 to the effective date of termination, and, as so amended and extended, said lease is hereby ratified and confirmed in all respects."
Under such extension, and after it came into operation on June 1, 1955, although gasoline was sold in quantities *52 over the monthly gallonage figure of 13,000 gallons provided in the original lease, Shell declined to pay (as it had been paying at the time the term under the original lease ended) amounts based on this excess monthly gallonage. This it did in reliance upon the provision in the extension agreement reserving rent "* * * at the rate of Two Hundred and Thirty Dollars ($230.00) per month * * *," and on the postulate that such reservation of rent was an integrated whole, and in substitution of all that the primary lease had provided for by way of rent. Farber, on the other hand, contending that the gallonage provision in the original lease carried over into the extension agreement, sought and obtained the judgment sub judice, accounting to him and awarding the amounts found therein to be due, based on the net monthly gallonage over 13,000 gallons.
It is immediately obvious that the core of validity of the judgment appealed from, embracing most of the rulings admitting the evidence on which it was based, is the propriety of the view of the learned court that the extension agreement was ambiguous in its setting, i.e., in relationship to the primary lease, most of the terms and conditions of which had been incorporated therein by reference, as noted above.
We perceive in the case before us no real dispute as to the fundamental law of contract interpretation, but rather conflicting views as to the propriety of its application to this agreement of extension. Shell insists that the extension agreement, in its quoted reference to the payment of rent, was, as stated, an integrated whole fully memorializing the compact of the parties in this respect. As forcibly, Farber contends that extension of the term of the primary lease "* * * upon the same terms and conditions as set forth" therein, as qualified by the language following such excerpt, incorporates in the extension compact, as one of such terms and conditions, the overriding gallonage stipulation therein contained. Our consideration of the phraseology of these documents, including, inter alia, (1) the debatable grammatical embracement of the "overriding gallonage" percentage *53 in the sense of the term "rent"; (2) the lack of a specific and separate description of the gallonage percentage yield as "rent," as for instance, used in Shell's sublease to its tenant on March 31, 1953 of the same corner (supra), in which such specificity appeared in these words, after the provision for fixed rent: "* * * plus a gallonage rental of One Half Cent (1/2¢) for each gallon * * *" (italics supplied); (3) the inherent disparity in concept of a fixed sum in cash and a sliding percentage dependent on monthly sales, as "rent"; and (4) the absence of a clause in the extension agreement clearly negating the continuance of the gallonage percentage as one of the terms and conditions thereby, and so broadly, incorporated, persuades us that the extension agreement in its relation to the primary lease was indeed ambiguous in its provision as to rent. We thus coincide with the determination of the trial court of that foundation of ambiguity in law, upon which the edifice of its terminal judgment was raised.
In the case of such ambiguity, there are pierced the barriers against evidence extrinsic to the otherwise exclusive written memorial of the parties' bargain, and this not to change, enlarge, curtail or contradict its terms (Naumberg v. Young, 44 N.J.L. 331 (Sup. Ct. 1882)), but for understanding and illumination thereof. Atlantic Northern Airlines, Inc., v. Schwimmer, 12 N.J. 293 (1953). The latter case holds that evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement, this being so even when the contract on its face is free from ambiguity, for the reason that
"* * * The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing  not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to *54 show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose. Casriel v. King, 2 N.J. 45 (1949)."
Our agreement with the basic determination of ambiguity renders unassailable the evidence rulings at the trial, for these, unnecessary of complete restatement here, were predicated upon that legal posture. They included, prominently, the divergent testimony of the representatives of the parties who negotiated the extension, one denying and the other affirming a discussion and agreement upon a proposal to abandon the overriding gallonage percentage in the new compact; a letter from Farber's attorney acknowledging receipt from Shell of the proposed draft of the extension agreement, referring to an "increase" in the rent for the extended term (when a substantial decrease, in fact, would be the result of abandonment of such percentage); the lack of any caveat by Shell to this projection, described on its face as conforming "* * * to our actual agreement for an increase of $25 monthly, for the extended period, over the existing monthly rental"; the proved reluctance of Farber to extend the term, and his agreement to do so under the persuasion of increased rental; the separate transmittal of checks, under the original lease, for the fixed monthly sum as "rent" and for the gallonage percentage, not so described; the preparation of the extension agreement by Shell, and the legal justification for construing its ambiguity most strongly against its author. Fletcher v. Interstate Chemical Co., 94 N.J.L. 332 (Sup. Ct. 1920), affirmed 95 N.J.L. 543 (E. & A. 1921); Moses v. Edward H. Ellis, Inc., 4 N.J. 315 (1950).
We have thus considered all of the evidence rulings of the court at trial, and deem them correct in law, particularly the rejection of an internal proposal memorandum offered by Shell as a "business record" under N.J.S. 2A:82-35. This exhibit would have added little to the *55 version fully testified to by its maker, and it was, in the circumstances, not improperly excluded. Tsibikas v. Morrof, 12 N.J. Super. 102 (App. Div. 1951).
Finally, as to the point that this judgment was against the weight of evidence, our scrutiny of that evidence leaves us in such complete agreement with the conclusions expressed in the well-reasoned oral opinion of the court, that we consider such judgment, on the contrary, to have been distinctively concordant therewith.
Affirmed.