238 N.J. Super. 588 (1990)
570 A.2d 472
LIQUI-BOX CORPORATION, A CORPORATION OF THE STATE OF OHIO, PLAINTIFF-APPELLANT-CROSS-RESPONDENT,
v.
ESTATE OF SIDNEY ELKMAN, DEFENDANT-RESPONDENT-CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 7, 1990.
Decided February 21, 1990.
*591 Before Judges KING, SHEBELL and BAIME.
Mitchell S. Berman argued the cause for appellant (Eisenstat, Gabage & Berman, attorneys; Mitchell S. Berman, on the brief).
Walter J. Fleischer, Jr., argued the cause for respondent (Shanley & Fisher, attorneys; Walter J. Fleischer, on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
This appeal and cross-appeal are from a bench trial which involved the interpretation of a commercial lease agreement for premises located in West Deptford Township. Plaintiff-appellant Liqui-Box Corporation (tenant) filed a verified complaint and obtained an order to show cause in the Chancery Division against the then defendant Jessup Industrial Park. The order to show cause sought judgment for possession of the leased premises and to enjoin defendant from interfering with plaintiff's possession, as well as reformation of the lease and compensatory damages. Thereafter, an order was entered denying plaintiff's request for possession and other injunctive relief, on the grounds that plaintiff could be compensated in damages.
Plaintiff then amended its complaint to substitute the Estate of Sidney Elkman (landlord) as a defendant, as it was Jessup's successor in interest, and seeking a judgment for damages in connection with defendant's allegedly wrongful eviction of plaintiff from the premises. Plaintiff also sought damages for defendant's alleged conversion of certain equipment belonging to plaintiff; however, this claim was later dismissed as defendant *592 agreed to waive any claim for storage charges for the equipment.
Defendant answered the amended complaint asserting that it had lawfully taken possession of the premises pursuant to the authority in the lease. It also filed a counterclaim seeking reimbursement for the costs of repairing the leased premises and of obtaining a new tenant, and for attorneys' fees.
After trial, judgment was entered in favor of defendant and against plaintiff on all claims. On its counterclaim, defendant was awarded: $15,135.21 in damages associated with reentering, repairing and reletting the property; $50,345.08 in attorneys' fees; and $3,531.04 in litigation costs, plus both pre-judgment and post-judgment interest.
The lease in question was entered into on December 1, 1968, by plaintiff's predecessor, Handi-Tap of New Jersey, Inc., and defendant's predecessor, Jessup Industrial Park. The lease was for a 25-year period to commence on January 1, 1969. Annual basic rent for the first year was $23,000, payable in equal monthly installments of $1,916.67.
The agreement allowed for reentry upon default, and provided that if the tenant vacated or abandoned the premises for a period of 30 days, then the landlord could, at its election, reenter and repossess the premises with or without process of law and remove the tenant without such reentry and repossession, working a forfeiture of the rents to be paid and the covenants to be performed during the full term of the agreement. The tenant further agreed to indemnify the landlord for any loss arising from such reentry, including the difference between the net income actually received by the landlord during any month of the demised term and the rent agreed to be paid by the terms of the lease, together with the expenses of reletting, commissions and attorneys' fees.
The lease required the tenant to maintain liability and fire insurance on the premises and allowed the tenant to sublet only upon the landlord's written consent, which consent should not *593 be unreasonably withheld. In addition, the tenant was required to pay all costs and expenses, including attorneys' fees for litigation brought by or against the tenant to which the landlord was made a party. The tenant was permitted under the terms of the lease to remove its equipment from the premises from time to time, and the landlord agreed not to disturb or interfere with the tenant's right of quiet enjoyment of the premises.
Plaintiff had used the premises to produce plastic containers, but apparently decided for business reasons to cease its operations in New Jersey. Plaintiff therefore undertook in early March 1987 to terminate the lease agreement by negotiations with representatives of the landlord. Plaintiff wanted to be compensated for getting out of the lease early, because it felt that the property could be relet for a higher rental than that required by the lease. Plaintiff advised the defendant's representatives that if the parties could not agree on a price, then plaintiff was going to exercise its option to sublet the premises. Plaintiff, in fact, entered into a listing agreement with a real estate broker sometime during March 1987. Defendant authorized a local realtor to negotiate with plaintiff to terminate the lease, but maintained that a physical inspection of the premises would have to be arranged before any deal could be negotiated.
On March 23, 1987, defendant's representative received a call from the individual who owned the land adjacent to the leased premises advising that the premises had already been vacated. Defendant's realtor also advised defendant that he had inspected the building and that no one was at the building any longer and that an employee of plaintiff had told the realtor that plaintiff had moved out on January 14, 1987, "give or take a day." Some employees had remained for two weeks after that date, and according to plaintiff's personnel records, the employees' time cards all ended on February 4, 1987, with the notation "plant closed."
According to the realtor, when he inspected the premises on March 23, he found one passage door unlocked. All furniture *594 had been removed, there were leaks in the ceiling tiles over the men's restroom, and the skylights had holes in them. There were small holes in the floor where machinery had previously been bolted down and electrical piping was hanging from the wall.
Defendant was instructed by legal counsel to verify insurance coverage, and to take possession of the building by changing the locks, and to put the building on the market for reletting. The locks were changed on March 31, 1987. According to a letter defendant's attorney received from plaintiff's attorney on April 6, 1987, insurance was being maintained by plaintiff; however, it was later determined that the insurance was no longer in force and that defendant had not been named as a loss payee in any event, as required by the lease. Apparently, only a property damage insurance policy was in force.
Defendant's attorney notified plaintiff, by letter dated March 30, 1987, of its being in breach of the lease and of defendant's intention to take advantage of all available remedies under the lease. Defendant ultimately relet the premises to another tenant, Mid-Atlantic Bag, for five years beginning October 1, 1987, at a monthly rental of $4,809.60 and increasing thereafter in a pre-set amount yearly; however, defendant agreed to reduce Mid-Atlantic's monthly rent by $500 for its storage of certain equipment left behind by plaintiff. Defendant was responsible for paying a broker's commission of $14,226.98, for procuring the new tenant.
As of the end of March 1987, plaintiff's equipment that remained on the demised premises consisted of two water towers, two air handlers, an air curtain, five chillers, a pit pump, and some piping and duct work, which had a combined estimated value of approximately $17,000. The actual cost of the equipment at plaintiff's premises prior to the pullout had been over one million dollars. A representative from Mid-Atlantic testified that the equipment left behind was completely stripped down, rusted and unusable. When plaintiff finally *595 removed the equipment in the fall of 1988, its representative had told Mid-Atlantic that it could keep any of the equipment it wanted.
Also introduced into evidence by the defense were copies of plaintiff's PSE & G bills for the period of December 1986 through March 1987. The invoices dated December 14, 1986, and January 16, 1987, showed billed amounts of $15,159 and $14,452, respectively. The bill dated February 17, 1987, was for only $65 and subsequent bills were for even less. Defendant introduced into evidence: (1) a letter dated May 18, 1987, which indicated that the security company had removed its leased security equipment from the premises on March 12, 1987, pursuant to a request from plaintiff's Maryland office; (2) a letter dated April 7, 1987, from plaintiff's attorney indicating that the bulk of plaintiff's property had been removed by February 26; and (3) a portion of plaintiff's annual report for 1987 which indicated to plaintiff's shareholders that, at the "beginning of 1987," plaintiff had closed an old manufacturing plant in West Deptford and had moved its production equipment to other locations.
Defendant also produced an insurance expert who testified that most fire and liability insurance policies exclude coverage for risks where the premises remain vacant or unoccupied beyond a certain number of days. She asserted that in the insurance industry, vacant means no longer being used for the intention of the original business, plus the removal of substantially all equipment. In her opinion, the carrier here would have definitely invoked such a vacancy clause to deny a claim had a loss occurred as of March 31, 1987. She based this opinion on the negligible amount of equipment left behind, the removal of the security system and the cessation of all operations. She noted that had the company simply laid off its employees and locked the place up  but left all its equipment  the premises would have been considered unoccupied but not vacant.
*596 In connection with its counterclaim, defendant also produced a roofing expert who testified that when he inspected the premises in December of 1987 the roof was leaking in several spots and needed to be replaced. His estimated updated cost for the work as of September 1988 was $56,694; however, as of the date of trial, this work had not yet been performed. A representative of defendant's new tenant testified that his company had to hire a roofing contractor to repair the roof in May 1988 because of leaks. The contractor's bill came to $2,450, which defendant paid. He added that, as of the date of trial, there were no leaks in the roof over the plant area and just some minor leaks in the office area.
Plaintiff contends that the trial judge erred in concluding that it had vacated the property for a period of 30 days thereby allowing defendant the right of reentry. In support of its argument, plaintiff points to "its continued payment of rent, utilities and property taxes, its continued utilization of the premises for the storage of certain items of equipment and its actions with respect to the potential subleasing of the premises."
The scope of appellate review of a judgment entered in a non-jury case is limited. The findings on which the judgment is based should not be disturbed unless they are not supported by adequate, substantial and credible evidence in the record. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974); Pioneer National Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338, 382 A.2d 933 (App.Div.), aff'd o.b., 78 N.J. 320, 394 A.2d 360 (1978). The fact findings and legal conclusions of the trial judge should not be disturbed unless the appellate court is convinced they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc., 65 N.J. at 484, 323 A.2d 495.
The trial judge here first noted that the lease provision in question used the phrase "vacate or abandon," thus suggesting *597 that the two terms were not intended to be synonymous and that evidence of either would suffice to constitute a material breach of the agreement. The judge held that abandonment could be found only where there had been an act accompanied by an intent to abandon, and that because plaintiff continued to pay rent and was actually trying to negotiate a sublease arrangement at the time it moved out of the building, defendant had failed to prove that plaintiff intended to abandon the premises.
The judge, however, ruled that vacate does not necessarily mean to be completely empty or devoid of both animate and inanimate objects. Rather, it means the substantial removal of all inanimate objects and the removal of the habitual presence of all persons. Applying that definition the judge found that as of March 31, 1987, plaintiff had vacated the premises for a period of 30 days. He concluded that the leaving behind of inconsequential items of equipment was not sufficient to avoid a finding that the plaintiff had vacated the premises.
The trial judge rejected plaintiff's argument that plaintiff's continuing payment of rent and its ongoing negotiations with defendant regarding subletting were fatal to a conclusion of vacancy. He found that, under the lease agreement itself, defendant was entitled to collect  and plaintiff was obligated to pay  rent even after the premises were vacated and reentered. Moreover, since vacating required no evidence of intent beyond an intentional removal of animate and inanimate objects, plaintiff's desire to sublease was of no particular relevance.
The trial judge also rejected plaintiff's argument that the lease provision that allowed the tenant to remove equipment "from time to time" prevented a finding of vacancy. The judge noted that this paragraph had to be read in conjunction with the clause pertaining to vacating and abandoning, and thus although plaintiff could remove its equipment and substitute other equipment for it, if it removed substantially all of its equipment and people for 30 days or more, plaintiff could be *598 deemed in default of the lease. The conclusion of the trial judge was that plaintiff did move substantially all of its inanimate objects and people and, therefore, vacated the premises at a date no later than February 4, 1987.
The judge was correct in his legal conclusion as to the meaning of "vacate." See Myers v. Merrimack Mutual Fire Ins. Co., 788 F.2d 468, 470 (7th Cir.1986). While this term could be interpreted to mean "completely" deprived of such objects so as to be totally empty, Foureal Co. v. National Molding Corp., 74 Misc.2d 316, 344 N.Y.S.2d 598, 601 (Dist.Ct. 1973), the judge noted that such an interpretation would allow a tenant to avoid being declared in default simply by leaving behind one item of negligible value. We agree that "vacate" in the context of this agreement means deprived of contents of "substantial" value. See Cavin v. Charter Oak Fire Ins. Co., 66 Ill. App.3d 808, 384 N.E.2d 441, 443 (App.Ct. 1978); Knoff v. U.S. Fidelity & Guaranty Co., 447 S.W.2d 497, 501 (Tex.Civ. App. 1969) (both cases interpreting the term "vacant" as used in an insurance policy). Hence, the use of a building, formerly used for other purposes, to store a few articles cannot defeat a claim of vacancy, Dunton v. Conn. Fire Ins. Co., 371 F.2d 329, 330 (7th Cir.1967), nor can the mere presence of several minimal items left behind. Myers v. Merrimack, 788 F.2d at 472.
The evidence here clearly demonstrates plaintiff completely moved out and left behind only that equipment which it had no intention of using or which was not usable. The employees were all laid off, operations were shut down, utilities were no longer needed and the building was left unsecured.
We agree with the trial judge that plaintiff's continuing to pay rent was of no moment because the lease required it to do so. Plaintiff's attempt to sublet and to negotiate a termination of the lease cannot deprive defendant of any of its rights under the lease in view of plaintiff's default in vacating the premises.
*599 Plaintiff also contends that even if it did vacate the premises, it was entitled to notice and a 60-day opportunity to cure. However, the lease agreement describes three separate categories of default. Clause (e) of Article V, paragraph 5.01 is the one that is applicable here. It specifically covers vacating or abandonment of the premises for a period of 30 days. That situation does not require the landlord to give the tenant any notice or opportunity to cure. The trial judge correctly found that there was no ambiguity with regard to this provision so as to require him to apply any special rules of construction, such as by favoring the tenant over the landlord, the non-draftsman over the draftsman, or nonforfeiture over forfeiture. See Carteret Properties v. Variety Donuts, Inc., 49 N.J. 116, 127, 228 A.2d 674 (1967); Schultz v. Kneidl, 56 N.J. Super. 575, 581-82, 153 A.2d 779 (Law Div. 1959), aff'd, 59 N.J. Super. 382, 157 A.2d 861 (App.Div. 1960). The judicial function when interpreting a contract is to accord the language a rational meaning in keeping with the purpose expressed. Jacobs v. Great Pacific Century Corp., 104 N.J. 580, 586, 518 A.2d 223 (1986); Farber v. Shell Oil Co., 47 N.J. Super. 48, 53-54, 135 A.2d 243 (App.Div. 1957).
Plaintiff also urges that defendant violated the implied covenant of good faith and fair dealing and the express covenant of quiet enjoyment. Plaintiff maintains that it had been a good tenant for over 18 years, regularly paying its rent and meeting its other obligations, and that defendant's conduct in locking plaintiff out of the premises, "without so much as the courtesy of a telephone call, was reprehensible under the circumstances."
In every contract there is the implied obligation that each party will refrain from doing anything which would have the effect of destroying or injuring the right of the other to receive the fruits of the agreement. Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522 (1965). This does not mean that a party is required to overlook its own rights *600 under the agreement to protect its property interests because such action is detrimental to the other party's interests. In interpreting a lease agreement the function of the court is to enforce the lease as written, not to write for the parties a different or better contract. Swisscraft Novelty Co., Inc. v. Alad Realty Corp., 113 N.J. Super. 416, 421, 274 A.2d 59 (App.Div. 1971).
With respect to plaintiff's argument that defendant breached the express covenant not to interfere with plaintiff's quiet enjoyment of its property, it is sufficient to note that defendant had the right under the lease agreement to reenter the property upon plaintiff's default and, therefore, cannot be deemed to have interfered with plaintiff's quiet enjoyment.
Plaintiff further contends that defendant acted in violation of plaintiff's right to due process because the lockout deprived plaintiff of its equipment and access to the property in which it held a leasehold estate. According to plaintiff, our Supreme Court's holding in Callen v. Sherman's, Inc., 92 N.J. 114, 455 A.2d 1102 (1983), required notice to plaintiff and a pre-deprivation hearing. In Callen, the Court was presented with two issues under the statutes that permitted a landlord to distrain the goods of a commercial tenant for unpaid rent. The first issue was whether distraint by a municipal constable constituted state action so as to invoke the protections of due process; the second was whether the statute provided a commercial tenant with sufficient notice and an opportunity to be heard so as to satisfy the requirement of due process. 92 N.J. at 117, 455 A.2d 1102. Nothing in Callen acts to restrict the conduct of a commercial landlord, acting on its own, to reenter its own property following a tenant's breach, in accordance with the agreed-upon provisions of a mutually negotiated and private lease agreement.
Plaintiff also claims error with regard to the court's award of damages to defendant. Regarding the award of counsel fees, plaintiff argues that although the agreement allows the landlord *601 to recover such fees if, without fault on its part, it is made a party to litigation commenced by the tenant, there was ample evidence of defendant's breach and of fault on its part, and therefore, no fee was allowable. We find plaintiff's argument in this regard to be clearly without merit and contrary to the factual determination of the trial judge. R. 2:11-3(e)(1)(E).
Plaintiff also contends that the trial court should have segregated out those counsel fees incurred by defendant in defending plaintiff's claim that defendant breached the lease which were not related to enforcing the covenants of the lease. However, under the lease, plaintiff agreed to pay after reentry of the premises all of the expenses incurred by the landlord in reletting, including commissions and attorneys' fees. In addition, the tenant agreed to pay all of the costs and expenses, including attorneys' fees, incurred by the landlord in connection with litigation commenced by the tenant to which the landlord was made a party. This later provision required the landlord to be without fault, and as stated no fault was found. Thus, there was no need for the trial court to make a distinction between those fees incurred by defendant in defending against plaintiff's complaint and those incurred by it in prosecuting its own counterclaim.
Plaintiff next argues that it should have been given a credit for the increased rental amounts which defendant received, and is continuing to receive, from the new tenant. Plaintiff claims that the substantial profit which defendant is reaping should be set off against any and all damages sustained by defendant. This argument was rejected by our Supreme Court in N.J. Indus. Properties, Inc. v. Y.C. & V.L., Inc., 100 N.J. 432, 495 A.2d 1320 (1985).
We do not find this case distinguishable merely because in N.J. Indus. the tenant did not pay the rent owed during the period the property was vacant, whereas plaintiff here did pay the full amount of rent during such period. Under N.J. Indus., the defaulting tenant is not entitled to credit the excess rent *602 that the landlord received towards the unpaid rent owed by the defaulting tenant for the period of time the property was vacant. 100 N.J. at 446, 495 A.2d 1320. This reasoning is in accordance with the theory that a breaching tenant should not profit by his own breach and is directly applicable here. As noted in N.J. Indus., as between the wrongdoer (the defaulting tenant) and the landlord who properly mitigated his damages, any benefit must go to the landlord because principles of fairness demand no less. Id. at 447, 495 A.2d 1320.
In its cross-appeal, defendant argues that the court erred by not awarding it damages for the cost of completely replacing the roof on the leased premises. The tenant agreed under the lease to keep the building in good repair, order and condition. At the termination of the lease, it agreed to surrender possession of the premises in good repair, order and condition, ordinary wear and tear excepted. It was this provision on which the trial judge relied in awarding damages to defendant for the cost of repairing the roof in question, which the judge found clearly leaked as of March 31, 1987. However, according to the judge, the repairs undertaken adequately fixed the leak and there was nothing to indicate that the repairs would not hold until December 31, 1993, the end of the original lease term. Defendant failed to establish that in order for the defects in the roof to be corrected, a total replacement was necessary. In view of the restricted scope of our appellate review, we cannot disturb the trial judge's findings in this regard.
The judgment appealed from is affirmed in all respects.