**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0519-24

WHITE OAK FUNDING, INC.,

    Plaintiff-Appellant,

v.

TWIN INDUSTRIES, W. MCD.,
INC., TWIN RESOURCES, INC.
and WILLIAM MCDAID,

    Defendants-Respondents.

_____

Submitted September 24, 2025 – Decided December 17, 2025

Before Judges Gummer, Paganelli, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0654-08.

Mandelbaum Barrett PC, attorneys for appellant (Jacqueline Greenberg Vogt, on the briefs).

Szaferman, Lakind, Blumstein & Blader, PC, attorneys for respondents (Steven L. Fox, of counsel and on the brief).

PER CURIAM

In this commercial-lease case, plaintiff White Oak Funding, Inc., which was the landlord, appeals from an order denying its Rule 1:10-3 motion for relief to litigant. Plaintiff asserted it was entitled to execute a judgment due to defendants' default of the parties' settlement agreement. Because the trial court did not enforce the agreement as written, we reverse and remand for entry of an order consistent with this opinion.

I.

On January 1, 2007, plaintiff and defendant Twin Industries executed a lease for property plaintiff owned in Eatontown. Defendant William McDaid agreed to "personally guarantee payment and performance of all obligations of Twin Industries" under the lease. McDaid is the president and owner of defendants Twin Industries, W. MCD., Inc. (MCD), and Twin Resources, Inc. (Twin Resources). Robert C. Epstein executed the lease on behalf of plaintiff as its president.

Paragraph 20 of the lease set forth plaintiff's remedies in the event of default:

> (a) If Tenant defaults in the performance of any conditions or covenants contained in this [l]ease, and such default can be cured solely by the payment of money, an Event of Default shall be deemed to have occurred if the default continues for five (5) days after Tenant receives notice of the default from [plaintiff]. If

2

Tenant defaults in the performance of any conditions or covenants contained in this [l]ease, and such default cannot be cured solely by the payment of money, an Event of Default shall be deemed to have occurred if the default continues for thirty (30) days after Tenant receives notice of the default from [plaintiff], unless the default cannot reasonably be cured in such time, in which case no Event of Default will be deemed to have occurred if Tenant is diligently working to cure the default . . . . (c) Upon the occurrence of an Event of Default, [plaintiff] may terminate this Lease and the Term upon five (5) days written notice to Tenant.

On April 23, 2008, plaintiff filed a complaint in the Law Division against Twin Industries and McDaid, alleging Twin Industries had breached the lease by failing to pay rent, taxes, and sewerage charges. Plaintiff subsequently added MCD as a defendant. The parties resolved the case as set forth in a Stipulation of Settlement dated March 1, 2009 (First Stipulation), which the court signed and entered on March 16, 2009.

Plaintiff later moved to enforce the First Stipulation. The court found defendants had defaulted by failing to make certain payments due under the terms of the First Stipulation. The court granted the motion and, on July 8, 2011, entered a judgment of possession and a judgment in the amount of $92,263.74 in plaintiff's favor. Thereafter, plaintiff, Twin Industries, MCD, and McDaid entered into a Second Stipulation of Settlement, which the court executed and entered on December 21, 2011.

3

Asserting defendants had defaulted again, plaintiff subsequently sought possession of the property and enforcement of the judgment. Plaintiff, MCD, McDaid, and Twin Resources entered into a Third Stipulation of Settlement, which the court executed and entered on August 1, 2014.[1] In the Third Stipulation, the parties agreed to extend the lease through December 31, 2024, and that "[a]ll terms and conditions of the [l]ease, as modified by the [First] Stipulation, the Second Stipulation and this Third Stipulation" would govern during the extended lease term.

In paragraph 2 of the Third Stipulation, the parties set forth in detail the rent payment obligations that would be in place during the extended lease term, including that "[a]ll rental payments shall be delivered to [plaintiff] on the first of every month." In paragraph 8, the parties agreed plaintiff had the right to enter the property to "make any repairs . . . [plaintiff] deem[ed] necessary or appropriate in its sole and unreviewable discretion." In paragraph 11, the parties agreed that if "defendants timely remit all payments and perform all obligations due under the [l]ease, the [First] Stipulation, the Second Stipulation and this

---

[1] In the Third Stipulation, the parties described MCD as "d/b/a Twin Industries." They stated Twin Resources had been "previously mistakenly identified in the caption" as Twin Industries and agreed Twin Resources was a defendant and judgment debtor.

4

Third Stipulation, including all payments and obligations due . . . , time being of the essence in all cases, then [plaintiff] shall forbear from executing upon the [j]udgment" and at the end of the extended lease term, the judgment would be deemed satisfied.   In paragraph nine, they agreed the total amount due under the judgment including interest was $100,000 and that interest would continue to accrue until the judgment was paid in full.

The Third Stipulation also contained provisions regarding the parties' agreements concerning the consequences of untimely payments:

> 12.  <u>Time is of the essence for all payments and performance due</u> from the defendants under the Lease, the [First] Stipulation, the Second Stipulation and this Third Stipulation.  Defendants must make all payments to [plaintiff] by certified or bank check and a payment in any other form will be deemed a non-payment. Defendants shall deliver all payments to [plaintiff] at the following address:  1 Tall Oaks Drive, Warren, New Jersey 07059.  <u>Defendants bear all risks of mailing, non-delivery, force majeur[e] and any other event or circumstance which may delay delivery of any payment to [plaintiff]</u>.

> 13.  <u>In the event that any payment is not received by [plaintiff]</u> at the address noted above <u>before 7:00 p.m. on the due date, time being of the essence in all cases, and no matter how slight the delay</u>, then defendants <u>automatically shall be in default under the [l]ease</u>, the [First] Stipulation, the Second Stipulation and this Third Stipulation, without the need for notice of any kind from [plaintiff].  <u>This paragraph supersedes</u>

A-0519-24

anything to the contrary in paragraphs 4 and 20 of the Lease.

     14. <u>In the event that defendants fail to make any payment or perform any obligation when due, time being of the essence in all cases, and no matter how slight the delay</u>, then defendants <u>automatically shall be in default</u> under the Lease, the [First] Stipulation, the Second Stipulation and this Third Stipulation, without the need for notice of any kind from [plaintiff]. This paragraph supersedes anything to the contrary in paragraphs 4 and 20 of the [l]ease.

[(Emphasis added).]

In paragraph 15 of the Third Stipulation, the parties agreed that "[i]n the event of a default by defendants, . . . [plaintiff] shall have all rights and remedies as are provided in the [l]ease, the [First] Stipulation, the Second Stipulation and this Third Stipulation, in addition to any and all rights and remedies provided by law." In paragraph 20, defendants represented they had "voluntarily elected to enter into this Third Stipulation after consulting counsel."

In a June 18, 2021 letter, Epstein, identifying himself as plaintiff's counsel, informed Twin Resources's counsel he "was stunned to learn . . . recently that Twin [Resources] vacated the [p]roperty [eighteen months] ago." He stated he had visited the property and found it to be "in deplorable condition." He advised counsel Twin Resources was in default of the lease, specifically paragraph 11(a), which states:

6

> Tenant shall take good care of the [p]roperty and shall, at its own cost and expense, maintain the [p]roperty in good condition, except for wear and tear from reasonable use and damage by the elements not resulting from Tenant's neglect or fault.

On plaintiff's behalf, Epstein demanded access to the property based on Twin Resources's purported abandonment of the property and further insisted Twin Resources "immediately undertake the repairs and maintenance necessary to restore the [p]roperty to good condition." Epstein asked counsel to advise him if Twin Resources was willing to make the repairs and, if so, to "coordinate with [him] to identify the necessary repairs and set a time frame for completing them." He advised counsel that if Twin Resources refused to perform the repairs "promptly," plaintiff would perform the repairs and charge Twin Resources for their cost.

In an August 2, 2022 letter, Epstein informed Twin Resources's counsel that since the June 18, 2021 letter, Twin Resources had failed to perform any repairs to the property. He asserted Twin Resources was in default due to its "failure to pay each month's rent[] when due," abandonment of the property, and failure to maintain the property in good condition and repair it, listing "deficiencies" in the condition of the property that were purportedly due to Twin Resources's failure to maintain the property. He informed counsel plaintiff

7

would exercise its right under paragraph 8 of the Third Stipulation to enter the property to make repairs and would "exercise all available legal remedies to hold Twin [Resources] and [McDaid] accountable for those [repair] costs." He also advised counsel that due to Twin Resources's defaults, plaintiff was no longer required to forbear from enforcing the judgment and would "proceed[] accordingly." The record is devoid of any evidence defendants responded to either the June 18, 2021 letter or the August 2, 2022 letter.

In a March 2, 2024 email, Epstein advised Twin Resources's counsel that plaintiff had not received the rent payment that was due on March 1, 2024, and, consequently, Twin Resources was in default. McDaid responded, stating the payment had been sent by Federal Express on February 29 for delivery on March 1 and "[i]t looks like it is still in transit with Mon[day, March 4, 2024] delivery" In a March 5, 2024 email to McDaid, Epstein confirmed plaintiff had received the rent on March 4 and was accepting it "under a full reservation of rights, without prejudice to [plaintiff's] rights and claims."

In a July 3, 2024 letter, plaintiff's counsel advised defendants' counsel Twin Resources had defaulted under the Third Stipulation in two ways: by failing "to take good care of the [p]remises and maintain the [p]remises in good condition" and "to timely pay rent due for March 2024." He stated plaintiff was

8

entitled to execute on the judgment, which he asserted then equaled $150,417 including interest, and expected Twin Resources and McDaid to pay plaintiff $50,750 in estimated repair costs.

On July 25, 2024, plaintiff moved for relief to litigant, seeking a judgment declaring defendants had violated the Third Stipulation, plaintiff was entitled to execute on the judgment and to a counsel-fee award, and defendants had to pay plaintiff $50,750 to restore the property to good condition. In support of that motion, Epstein certified MCD and Twin Industries had defaulted "over an extended period by failing to maintain the [p]remises in good condition" and by failing to pay the March 2024 rent timely. He attached to his certification a document containing a list of repairs, which would "restore the [p]remises to good condition as required by the [l]ease and Third Stipulation" and the estimated costs of those repairs.

In opposition, defendants submitted McDaid's certification, in which he denied defendants were in default, had abandoned the property, or had failed to maintain the property in good condition. Conceding defendants had not repaired the deficiencies in the property's condition plaintiff had identified, McDaid certified defendants had "maintained the property basically in the condition [p]laintiff provided to [defendants] at the beginning of the leasehold with some

9

minor repairs to be made." Contending plaintiff had acted prematurely in declaring defendants in default based on the condition of the property, McDaid represented defendants were "prepared to make the repairs set forth in" the document attached to Epstein's certification "before the end of the lease term." McDaid did not dispute plaintiff had received the March 2024 rent payment after the March 1 due date but certified defendants had given the check to Federal Express on February 29 for overnight delivery and that plaintiff had accepted that check and subsequent rent checks defendants submitted. He also asserted that part of the monthly payments set forth in the Third Stipulation "is the amortized [j]udgment . . . 'disguised' as rent" and that awarding the full amount of the judgment would be inequitable because it would "result[] in [p]laintiff recovering almost double of the [j]udgment."

By order dated September 16, 2024, the court denied the motion for the reasons expressed on the record on September 13, 2024. The court held plaintiff had not presented sufficient evidence of default "as to a late payment in violation of the explicit terms of [the] agreement, . . . the property was vacated or that the property has failed to have been maintained" Regarding the March 2024 payment, the court found:

> the payment . . . made was in accord with the specific
> language of the lease agreement. While the agreement

10

> provides that time is of the essence, it also goes on to say that all rental payments shall be delivered to [plaintiff] on the 1st of every month. I don't see any language that provides that if your carrier gets it to us a couple of days late, that you are in violation of the agreement.

Regarding the condition of the property, the court understood defendants to have represented they intended to conduct certain repairs before the end of the lease term. Referencing defendants' prior timely payments and that plaintiff had claimed default towards the end of the lease term and sought payment "above and beyond what would remain paying under" the lease term, the court stated it was

> not going to countenance what it perceives to potentially be a sharp business practice or a sharp motion practice. And I'm not saying that's what is occurring, but I am saying that it certainly could appear to the casual observer, or even to this court, as that which is being practiced here.

This appeal followed. Plaintiff argues the court erred in failing to enforce the Third Stipulation as written, in finding the March 2024 payment complied with the Third Stipulation, and in failing to enforce the Third Stipulation based on defendants' default under the lease for failing to initiate repairs within thirty days following the June 18, 2021 letter. In response, defendants deny they breached the Third Stipulation by failing to make a timely rent payment and

11

contend, among other things, they "substantially complied" with the Third Stipulation and that plaintiff is seeking "double recovery" of the judgment.

## II.

A lease is a contract. Town of Kearny v. Disc. City of Old Bridge, Inc., 205 N.J. 386, 411 (2011). A settlement agreement between parties to a lawsuit, such as a stipulation of settlement, also is a contract. Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 438 (App. Div. 2016); see also Quinn v. Quinn, 225 N.J. 34, 45 (2016) (finding "[a] settlement agreement is governed by basic contract principles"). Accordingly, we analyze the parties' agreements under the familiar rules of contract interpretation.

In doing so, "[b]ecause contract interpretation is a question of law we review de novo, we 'pay no special deference to the trial court's interpretation and look at the contract with fresh eyes.'" Del. River Joint Toll Bridge Comm'n v. George Harms Constr. Co., 258 N.J. 286, 303 (2024) (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)). "[W]e owe no deference to the [trial court's] interpretation of the law and the legal consequences that flow from established facts." 160 W. Broadway Assocs., LP v. 1 Mem'l Drive, LLC, 466 N.J. Super. 600, 610 (App. Div. 2021). Regarding factual findings, we defer to a "trial court that heard the witnesses" and generally do not disturb its factual findings "unless

A-0519-24

[we are] convinced that those findings . . . were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interest of justice.'" Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (quoting Rova Farms Resort v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). In deciding plaintiff's motion, the court did not hear witnesses but reviewed the certifications of the parties' presidents.

"The plain language of the contract is the cornerstone of [a court's] interpretive inquiry." Extech Bldg. Materials, Inc. v. E&N Constr. Inc., ___ N.J. ___, ___ (2025) (alteration in original) (slip op. at 9) (quoting Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020)). "[U]nambiguous contracts will be enforced as written unless they are illegal or otherwise violate public policy." Ibid. (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)). The "court's task was 'not to rewrite a contract for the parties better than or different from the one they wrote for themselves.'" Globe Motor Co. v. Igdalev, 225 N.J. 469, 483 (2016) (quoting Kieffer, 205 N.J. at 223); see also Liqui-Box Corp. v. Est. of Elkman, 238 N.J. Super. 588, 600 (App. Div. 1990) (noting that the court's function is to "enforce the lease as written, not to write for the parties a different or better contract").

A-0519-24

The basic principles of contract interpretation apply equally to settlement agreements. A settlement agreement is a contract "which 'may be freely entered into and which a court, absent a demonstration of fraud or other compelling circumstances, should honor and enforce as it does other contracts.'" Jennings v. Reed, 381 N.J. Super. 217, 227 (App. Div. 2005) (quoting Pascarella v. Bruck, 190 N.J. Super. 118, 124-25 (App. Div. 1983)) (internal quotation marks omitted). "[T]here is a strong public policy favoring settlement of litigation." Capparelli v. Lopatin, 459 N.J. Super. 584, 603 (App. Div. 2019). That policy is based on "the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone." Jennings, 381 N.J. Super. at 226-27 (quoting Peskin v. Peskin, 271 N.J. Super. 261, 275 (App. Div. 1994)). "Consequently, courts 'strain to give effect to the terms of a settlement wherever possible.'" Id. at 227 (quoting Dep't of Pub. Advoc. v. N.J. Bd. of Pub. Util., 206 N.J. Super. 523, 528 (App. Div. 1985)).

Applying those bedrock tenets to the parties' unambiguous contract language, we conclude the trial court erred in its interpretation of the parties' agreement and the undisputed evidence when it found plaintiff had not presented sufficient evidence of default "as to a late payment in violation of the explicit

14

terms" of the Third Stipulation. Defendants do not contest that plaintiff received the March 2024 rent payment after the March 1 due date. In his March 2, 2024 email, McDaid acknowledged the payment was "still in transit with [a] Mon[day, March 4, 2024] delivery."

The language in the Third Stipulation concerning the timing and timeliness of rent payments could not have been clearer, and defendants do not assert otherwise. The rent payments had to be "delivered to" and "received by" plaintiff, not simply mailed by defendants, before 7:00 p.m. on the first day of the month. The court erred in not "see[ing] any language that provides that if your carrier gets it to us a couple of days late, that you are in violation of the agreement." In fact, in paragraph 12 of the Third Stipulation, the parties agreed defendants would "bear all risks of mailing, non-delivery, force majeur[e] and any other event or circumstance which may delay delivery of any payment to [plaintiff]."

What was the consequence of a late rent payment? Under paragraphs 13 and 14 of the Third Stipulation, a failure to pay timely, "no matter how slight the delay," meant defendants were "automatically . . . in default" under the lease and the parties' stipulations. Under paragraph 11 of the Third Stipulation, timely submission of payments was a condition for deeming the judgment satisfied at

15

the end of the extended lease term. Because defendants had failed to "timely remit all payments," the judgment would not be deemed satisfied at the expiration of the extended lease term and plaintiff no longer had to "forbear from executing" on the judgment.

The court also erred in concluding plaintiff had not presented sufficient evidence of default as to defendants' failure to maintain the property. Under paragraph 11(a) of the lease, the tenant was required to "take good care of the [p]roperty and . . . , at its own cost and expense, maintain the [p]roperty in good condition." In the June 18, 2021 letter, Epstein notified defendants they were in default based on that contractual provision. Defendants did not respond to the letter, did not challenge the declaration of default, and did not take any action to cure the default.[2]

What was the consequence of not addressing the notification of the property-condition default? The court indicated defendants could wait until the end of the lease term to conduct the repairs, finding "[p]laintiff has its remedies available to it" if "[p]laintiff gets to the end of the lease and [defendants have]

---

[2] We recognize that three years after Epstein sent the June 18, 2021 default letter, McDaid in opposition to plaintiff's motion asserted defendants had "maintained the property basically in the condition [p]laintiff provided . . . at the beginning of the leasehold," but he also conceded there were "some minor repairs to be made."

. . . failed to repair at that time." But the lease did not give defendants until the end of the lease term to cure defaults. Under paragraph 20 of the lease, defendants had thirty days after receiving notice of the default to cure a non-monetary default. Because defendants had not cured the default within thirty days of receiving notice, were not "diligently working to cure it," and had not asserted it could not be cured within thirty days, "an Event of Default" was "deemed to have occurred" and plaintiff could have terminated the lease. Under paragraph 11 of the Third Stipulation, timely "perform[ance of] all obligations due" under the lease and the stipulations was a condition for deeming the judgment satisfied at the end of the extended lease term. Because defendants had failed to timely "perform all obligations due," the judgment would not be deemed satisfied at the expiration of the extended lease term and plaintiff no longer had to "forbear from executing" on the judgment.

Without directly rendering a finding of "a sharp business practice," the court faulted plaintiff for continuing to collect rent from defendants after notifying defendants of their defaults. Paragraph 20 of the lease provided that "[u]pon the occurrence of an Event of Default, [plaintiff] may terminate this [l]ease." (Emphasis added). An Event of Default did not automatically terminate the lease. Plaintiff could have terminated the lease but was not

17

required to do so. Given that the lease had not been terminated, defendants had an obligation to pay the rent on property they had not vacated. Continuing to collect rent defendants were obligated to pay does not constitute "a sharp business practice" or bad faith warranting disregard of the clear language of the parties' agreements. Nor does it constitute a waiver of rights or merit the application of the doctrine of equitable estoppel. See In re Borough of Englewood Cliffs, 473 N.J. Super. 189, 202 (App. Div. 2022) (setting forth the elements of equitable estoppel); Knorr v. Smeal, 178 N.J. 169, 177 (2003) (finding a "party waiving a known right must do so clearly, unequivocally, and decisively").

Defendants contend plaintiff's enforcement of the judgment would result in a "double recovery" because, according to defendants, the rent payments they agreed to make in the Third Stipulation incorporated a payment towards the judgment. However, that argument is not supported by the language of the parties' agreement. Paragraph 2 of the Third Stipulation details the amount of the rent payments defendants were obligated to make during the extended lease period. Nothing in that paragraph, or any other provision of the Third Stipulation, indicates the rent payments included payments on the judgment or that any part of the rent payments would be used to pay down the judgment.

A-0519-24

Moreover, in paragraph 19 of the Third Stipulation, defendants made the following representations:

> Defendants agree that all of the rights and remedies granted to [plaintiff] in this Third Stipulation are fair, reasonable and enforceable, and the defendants hereby waive any claim, defense or contention that any of such rights and remedies is unenforceable in any way. The defendants represent that they have requested that [plaintiff] enter into this Third Stipulation in lieu of providing collateral to secure their performance under the Lease, the [First] Stipulation, the Second Stipulation and this Third Stipulation. The defendants acknowledge and agree that all of the rights and remedies set forth herein represent essential consideration given to [plaintiff] to enter into this Third Stipulation.

On this record and given the clear terms of the Third Stipulation, we are not persuaded permitting plaintiff to enforce the judgment would be inequitable.

Based on our de novo review and applicable principles of contract interpretation, we reverse the September 16, 2024 order denying plaintiff's motion for relief to litigant. We remand with instructions for the trial court to enter an order permitting plaintiff to execute on the July 8, 2011 judgment.

We note plaintiff in its motion sought entry of a judgment in the amount of $50,750, "representing the costs to restore the subject premises to good condition as required by the Third Stipulation of Settlement," in addition to an order permitting it to execute on the July 8, 2011 judgment. However, neither

19

the lease nor the Third Stipulation provide plaintiff with repayment of repair costs as a remedy for defendants' default. Plaintiff may otherwise have a right to repayment of repair costs, but because that remedy was not included in the parties' agreements, we perceive no error by the court in not awarding a judgment in plaintiff's favor for repayment of repair costs in response to plaintiff's motion for relief to litigant.

We also note plaintiff in its motion sought an award of counsel fees. Plaintiff did not address the court's denial of its fee application in its appellate briefs. Accordingly, we deem that argument waived. See N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) (finding "[a]n issue that is not briefed is deemed waived upon appeal").

Reversed and remanded for entry of an order consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

20                                                      A-0519-24