In the Matter of CHESHIRE MOLDING COMPANY, Debtor.

CHESHIRE ASSOCIATES, Plaintiff,

v.

CHESHIRE MOLDING COMPANY, Debtor, Defendant.

Bankruptcy No. 2–80–00145.
Adv. No. 2–80–0396.

United States Bankruptcy Court, D. Connecticut.

Feb. 25, 1981.

William B. Fitzgerald, Jr., and William P. Yelenak of Carmody & Torrance, Waterbury, Conn., for plaintiff.

John B. Nolan and James J. Tancredi of Day, Berry & Howard, Hartford, Conn., for defendant.

## MEMORANDUM AND ORDER

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

This adversary proceeding is before the court upon a request by a lessor to terminate the automatic stay of 11 U.S.C. § 362 in order to permit it to obtain possession of the leased premises. The defendant debtor-in-possession, Cheshire Molding Company (Molding) filed a Chapter 11 petition on February 15, 1980. On September 11, 1980, the plaintiff-lessor, Cheshire Associates (Associates) filed its "Complaint to Terminate Stay".

Associates owns the fee of a 15-acre parcel located at 601 West Johnson Avenue, Cheshire, Connecticut (premises) upon which is located an industrial building with 66,557 square feet of shop and office space, and a paved parking lot. Molding has occupied the premises since May 24, 1979, under an assigned lease, dated August 11, 1966, which provided for an initial term of twenty years, and options to extend for two additional five-year terms. Annual rent under the lease is approximately $1.00 per square foot of building space. When Molding filed its petition for relief there were seven remaining years of the initial term.

Molding was engaged in the business of manufacturing molded plastic products at the premises from May, 1979 until financial difficulties caused it to shut down in February, 1980. Substantially all of Molding's equipment and inventory have since been removed from the premises and sold, and the proceeds applied to a secured lender's debt. The premises have been empty since July, 1980. Molding does not intend to

engage in further manufacturing operations at the premises or elsewhere. Molding's petition showed an indebtedness of $715,000.00 to The Connecticut Bank and Trust Company (CBT) secured by all of Molding's inventory, accounts receivable, equipment and proceeds, and unsecured debts of $540,384.00. Among Molding's listed assets, $250,000.00 was attributed to Molding's leasehold interest in the premises. Charles E. Heilig, Jr., Molding's president and sole stockholder, was listed as a creditor in the amount of $160,000.00. Heilig has personally guaranteed Molding's performance under the lease.

After Molding ceased its manufacturing operations, it sought to market its leasehold interest through brokers specializing in the sale or leasing of industrial property. It current broker, H. Pearce Company (Pearce), began its marketing efforts in March, 1980. Pearce has advertised the availability of the premises at a rental of $2.50 per square foot in real estate trade journals throughout New England. In September, Pearce mailed brochures describing the property to approximately 1,600 companies, including other brokers, who might be interested in the premises. The only serious prospect at the time of trial was General Electric Corporation (GE). GE, however, professes to be interested in acquiring the leasehold only if it can also buy the fee of the premises. Pearce contacted Associates in an unsuccessful attempt to arrange a joint sale of the freehold and leasehold. Associates sent notice in September, 1980, to Molding, purporting to terminate the lease because of alleged post-petition defaults, and filed the instant complaint to terminate the automatic stay to allow it to gain possession of the premises.

In its complaint, Associates alleges that Molding has violated certain lease covenants by vacating the premises and by failing to pay town real estate taxes. As a result, Associates avers, it is entitled by the terms of the lease to immediate possession of the premises. Associates claims that the alleged vacation of the premises cannot be cured by Molding, that Molding has no equity in the premises, that the premises are not necessary to an effective reorganization of Molding's business, and that if not permitted to obtain possession, Associates will suffer irreparable injury, loss and damage.

Associates claims to have shown at the trial that Molding further violated lease covenants by its failure to repair cracked windows, by failure to keep the parking area in good condition, and by not maintaining proper insurance. Molding produced evidence however, sufficient to establish that all town taxes are paid, that there is full insurance coverage, and that the building is heated and otherwise adequately maintained and that the parking lot disrepair is not significant enough to form the basis of a default. As of the time of trial, Molding owed about $1,100,000.00 to its creditors—$300,000.00 to CBT, $600,000.00 to various unsecured creditors, and $200,000.00 to Heilig. Heilig is advancing funds to Molding for the costs of maintaining and marketing the lease, including the rent payments, insurance premiums, taxes and expenses for safeguarding the building. Molding's assets, aside from the disputed lease, currently consist of two pieces of unsold machinery, claimed to be worth $28,000.00, $10,000.00 in cash, and an aged account receivable of $50,000.00. Heilig, in addition to being a personal guarantor of the lease, is also personal guarantor of Molding's $300,000.00 indebtedness to CBT. CBT holds stock owned by Heilig with a value of $900,000.00 as additional security for Molding's loan. The issues, therefore, to be resolved as presented by the pleadings and the testimony, are: (1) whether or not Molding's actions in ceasing operations and removing its machinery and inventory are sufficient to trigger the default provision in the lease with respect to vacation of the premises, and (2) if Molding is in default under the lease, can Associates prevail under § 362d with respect to terminating the automatic stay?

Paragraph 15(a)(v) of the lease reads:

(15) *Re-Entry Upon Default*

   (a) Lessee covenants and agrees to and with Lessor that any one or more of

the following events shall be considered events of default as said term is used herein, . . . that is to say, if:

.   .   .   .   .

(v) Lessee shall vacate the premises or abandon the same during the term thereof . . .

Subsection (c) of paragraph 15 provides for termination of the lease and re-entry and repossession upon default. Associates claims that Molding vacated the premises after the commencement of the Chapter 11 case, thus extinguishing its leasehold rights. Associates also points to Paragraph 8 of the lease, entitled *USE*, subparagraph (a), to support its claim that by not using the premises as called for by the lease, Molding has vacated.[1] Neither party has offered any Connecticut decisional law directly in point on the issue of what constitutes vacation of premises. Associates claims that the term "vacate" in the lease should be defined as:

> To move out; to make vacant or empty; to leave; especially to surrender possession by removal; to cease from occupancy. *Black's Law Dictionary*, 4th ed. (1968).

Molding also claims that a definition from *Black's Law Dictionary* should be considered and offers "vacant";

> Empty; unoccupied; as "vacant" office . . . Deprived of contents, without inanimate objects. *It implies entire abandonment, nonoccupancy for any purpose.* (Emphasis supplied by Molding).

Molding proceeds to argue that it has never intended to surrender possession or abandon the premises, and that it continues to occupy them for the purpose of assigning the lease.

---

1. (8) *USE*.
   (a) The premises shall be used and occupied by Lessee only for the purpose of the development, manufacture, sale, packaging and storage of various products and all activities connected therewith or relating thereto . . .

2. This is also the rule with respect to federal bankruptcy law, where unexpired leases may turn out to be valuable assets of the estate.

▮ The rule of law followed in Connecticut with regard to lease provisions, the enforcement of which would lead to a forfeiture, is that such provisions "will always be construed strictly as against the lessor and in such a way as to prevent, rather than aid, the forfeiture." *Camp v. Scott*, 47· Conn. 366, 375 (1879). See also *Newfield Building Co. v. Mohican Co.*, 105 Conn. 488, 494, 136 A. 78 (1927).[2] Under the circumstances presented by the proceeding at bar, the court holds that Molding has not vacated the premises so as to constitute an event of default under the lease. Molding has continuously paid the rent and is current on its premiums for required fire and rent insurance. It maintains a periodic presence at the premises, heats the building, has an alarm system in operation, and provides grass-cutting and snow-removal. I do not find that the cessation of operations and the absence of machinery or inventory is sufficient to overcome the implications of these other actions of Molding. This is particularly true where the premises comprise a freestanding unit, and the rents called for under the lease are not based on sales or other activities on the premises. There is an obvious connection between Associate's attempt to terminate Molding's leasehold and its awareness of and involvement in negotiations for a potential sale of the premises to GE. Associates has not persuaded the court that it would be equitable to construe Molding's acts as a violation of the lease, and the court holds that Molding's leasehold interest, which became property of the Chapter 11 estate at the commencement of the case, is not now in default.

Even if I am in error in deciding there is no existing default under the lease, I hold that Associates would not be entitled to have the § 362 stay terminated to permit it to obtain possession of the premises.[3]

---

*Finn v. Meighan*, 325 U.S. 300, 301, 65 S.Ct. 1147, 1148, 89 L.Ed. 1624 (1944); *Smith v. Hoboken Railroad, Warehouse and Steamship Connecting Co.*, 328 U.S. 123, 128, 132, 66 S.Ct. 947, 950, 952, 90 L.Ed. 1123 (1945).

3. *Section 362.*

.   .   .   .   .

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief

■ With respect to the required showing under § 362(d)(2), Associates asserts that there can be no equity for the estate in Molding's leasehold property interest inasmuch as Molding itself lacks sufficient assets to continue rental payments and fulfill other obligations under the lease. Associates called as a witness an appraiser who testified that despite a substantial increase in fair market rental value of the leased premises, no equity in the lease can exist for Molding because of its lack of assets to meet lease obligations. An appraiser presented by Molding testified that the present fair market value of the building space occupied by Molding is $2.50 per square foot, and that there is substantial equity in the lease represented by the difference between its rent obligation of $1.00 and the fair market value of $2.50. The appraiser determined that the present value of the leasehold is $605,000.00 based on an available remaining lease term of 17 years. As long as Heilig continues to fulfill Molding's obligations under the lease, Molding has an equity in the leasehold. If Molding is able to market its leasehold interest at the fair market value, proceeds of the sale will provide a substantial dividend to creditors. Associates has not borne its burden of proving that there is no equity for the

debtor-in-possession. Having so found there is no need to further inquire as to the need of the premises for the orderly liquidation allowed by 11 U.S.C. § 1123(b)(4), although that would appear to be obvious.

■ It is true that a year has passed since Molding filed its Chapter 11 petition, but the evidence has not revealed any lack of adequate protection of Associates' interest in the premises. As stated, all monetary obligations under the lease continue to be discharged. Sometime soon, circumstances must lead this case to result either in a profitable transfer of Molding's leasehold interest, or a rejection of that interest. Should a time come when Heilig ceases to advance monies on behalf of Molding to discharge lease obligations, nothing would impede Associates from applying for and receiving summary determination of its right to immediate relief from stay. That time has not come. In view of the reasonable possibility Molding has shown that it may be able to market its leasehold interest, and in view of the fact that the monetary lease obligations are current and Associates has established no other cause under § 362(d)(1), I hold that Associates' request to terminate the automatic stay provided for by § 362(a) must be, and hereby is, denied.[4]

from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
    (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
    (2) with respect to a stay of an act against property, if—
        (A) the debtor does not have an equity in such property; and
        (B) such property is not necessary to an effective reorganization. . . .
(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—
    (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
    (2) the party opposing such relief has the burden of proof on all other issues.
4. Both pre and post-code decisions amply support the general proposition that in reorganization cases a thorough scrutiny of all the circumstances must precede any determination of

whether or not a landlord is to be granted possession of premises leased by a debtor or relief from stay to seek possession in state courts notwithstanding defaults under lease clauses. See especially, *Smith v. Hoboken Railroad, supra; In re Fleetwood Motel Corporation*, 335 F.2d 857 (3rd Cir. 1964); *Weaver v. Hutson*, 459 F.2d 741 (4th Cir. 1972); *Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F.2d 202 (2nd Cir. 1974); *In re D. H. Overmyer Co., Inc.*, 510 F.2d 329 (2nd Cir. 1975); *In re Fontainebleau Hotel Corporation*, 515 F.2d 913 (5th Cir. 1975); *In re Great Scott Food Market, Inc.*, 1 BR 223 (BC D. R.I. 1979); *Matter of Furniture Warehouse Sales, Inc.*, 2 BR 293 (BC N.D.Ga.1980) *In re A. L. S., Inc.*, 3 BR 107 (BC E.D.Pa.1980); *In re Belize Airways Ltd.*, 5 BR 152 (Bkrtcy.BC S.D.Fla.1980). The cases cited repeatedly stress the importance of the disputed leasehold to the success of reorganization, especially in those cases where the lease is the only substantial asset of the debtor. To a great extent, the results of pre-code decisions cited herein have been codified by 11 U.S.C. § 365(b), which permits a trustee (or debtor-in-posses-

This memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Rule 752 of the Rules of Bankruptcy Procedure.

sion) to cure any default under a lease notwithstanding the terms of the lease agreement. 2

*Collier on Bankruptcy* (15th ed.) ¶ 365.04 *passim.*