[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for a declaratory judgment. Through a CT Page 10514 series of transfers of interests[1] the plaintiffs are the lessors and the defendant Service Merchandise Co., Inc. ("Service") is the lessee of land at Bishop's Corner, roughly the intersection of North Main Street and Albany Avenue in the town of West Hartford. Although the business organization of the plaintiff partnerships is rather intricate, it was apparent from the evidence that the Konover family is the controlling interest; the landlord may be referred to as "the Konovers", except where more precision is necessary.
The lease in issue is a "ground lease" which was executed in 1965; a significant amendment was executed in 1966. Both the original lease and the amendment refer to neighboring land, also to be used for retail purposes. The term of the ground lease is 65 years. As contemplated in the lease, a building for retail purposes was constructed; the building contains approximately 69,000 square feet. In 1989 Service subleased to another retail business, The Casual Male, a portion of the premises consisting of approximately 2,400 square feet.
Early in 1997, Service, which operates a number of retail locations in a number of states, made the business decision to close a number of its stores. By letter dated March 27, 1997, Service notified Konover that it intended to close the Bishop's Corner store; it stressed that it intended "to honor the terms of our lease" and that it hoped to find "a replacement user" as soon as possible. In the next several months Konover and Service discussed the logical option of Konover's purchasing Service's leasehold interest, but the negotiations terminated when the parties were too far apart on price.
Specific negotiations between Michael Konover and Simon Konover[2] on one side and Ray Zimmerman, the CEO of Service, and Floyd Dean, Service's vice president for real estate, on the other, took place at a convention in Las Vegas in May, 1997. It became clear that the parties were far apart, and Michael Konover mentioned that a provision in the lease might present some difficulty for Service. After the convention, Dean expressed some difficulty in finding what provision Michael was referring to; Michael ended up faxing to Service a copy of § 21(b) of the original lease, which, among other things, indicated that "if tenant shall vacate or abandon the demised premises, the landlord shall have the right to cancel and terminate the lease as well as the right to cancel and terminate all of the right, title and interest of tenant" in the ground lease. The fax was sent on June CT Page 10515 4, 1997, and the language regarding vacating the premises was highlighted with an arrow.
About a week before Michael Konover's fax, on May 27, 1997, Service and the defendant Trigg Realty LLC ("Trigg") had entered into an agreement regarding the assignment of the lease from Service to Trigg. The agreement was an option agreement of sorts: subject to a review period and other conditions, Trigg agreed to purchase the lease for $3,500,000.00. This was considerably more money than Konover had offered. The closing date was to be within 45 days. During the review period, Trigg began to conduct various feasibility studies, including Phase I and Phase II environmental studies. Almost from the day of signing the agreement, Trigg was engaged in marketing the premises to retailers, as Trigg had no intention of being the ultimate user of the premises.
On July 8, 1997, Trigg sent a letter to Service which expressed some concern about possible environmental problems. On July 10, 1997, an amended agreement between Trigg and Service was executed. In this agreement, the review period was extended to August 10, 1997, with a contemplated closing by no later than September 12. There was no evidence that either Service or Trigg anticipated this declaratory judgment action, which was brought by Konover on July 14, 1997. Thus, as of July 11, 1997, the premises most likely would not be able to be occupied for several months.
In the meantime, Service, acting through its general counsel Michael Brennan, wrote to Michael Konover on June 6, 1997, two days after receiving Konover's fax. He stated unequivocally that Service "had no plans to vacate or abandon the subject premises, and will continue to abide by the terms of its lease". He went on to state that Service would cease retail operations until a suitable replacement could be found. He said that a contract to assign the premises to Trigg Realty had been signed, and he cautioned Konover not to tortuously (sic) interfere with that contractual arrangement. He enclosed with the June 6 letter an "estoppel letter" for Michael Konover to sign; the estoppel letter in effect represented that there were no known defaults or other defenses "now existing" against the enforcement of any provisions of the lease. Konover's counsel replied to Brennan's letter on June 12, 1997: he thanked Brennan for the "update" on Service's intentions as to the premises, and bristled somewhat at other portions of the letter. He indicated that recent communications "focused precisely on the need for strict CT Page 10516 compliance with the terms of the lease" and said that Konover would "continue to vigorously enforce the lease in strict accordance with its terms." The estoppel certificate was, with a modification not relevant here, signed on June 26 and returned on June 30, 1997. At about the same time, on June 23, 1997, Michael Konover wrote to Floyd Dean at Service and suggested that if Service's contract with Trigg fell through (though Trigg was not specifically referenced), Service might want to discuss a possible deal with Konover.
On July 11, 1997, Service discontinued its retail operation on the premises.[3] The undisputed testimony is that left inside the building were a rather formidable jewelry display structure, two conveyor belts that transported merchandise to and from the basement, considerable shelving, and a small amount of furniture. The first floor was empty except for the jewelry display, some shelving, some of which was disassembled, and other miscellaneous items.
The basement was more full: metal shelving on which inventory had been placed was still in place, as were two conveyor belt apparati designed to move merchandise between floors. Some desks and chairs in offices were still there. Apparently all of the inventory was gone, and there were no longer any employees on the premises. Signs indicated to would-be customers that Service Merchandise had closed at that location. Service was, however, current on its rent and all other financial obligations, and a security system remained in place. The Casual Male continued to be in operation in its portion of the premises.
July 11 was a Friday. Michael Konover viewed the premises as well as he could from the outside on that Friday. On Monday, July 14, 1997, this declaratory judgment action was instituted. The action seeks a declaration that Service has run afoul of the "vacate or abandon" clause and that Konover may pursue its remedies under the lease. Service has, in its answer, admitted many of the factual allegations, but denies that Service has vacated or abandoned the premises. It also claimed estoppel as a special defense, and in a counterclaim sought injunctive relief against interference with the assignment to Trigg.[4] Trigg was also named as a defendant, quite appropriately, as it quite clearly has an interest in the controversy. Trigg's answer was similar to that of Service; it added, however, defenses of waiver and "unclean hands" on the part of Konover.
Trial was held on various days in September and October, CT Page 10517 1997, and the parties submitted two rounds of briefs.[5] The fundamental issue is whether, in the circumstances outlined above and to be developed in somewhat more detail subsequently, Service vacated the premises as the term was used in the lease.
There does not appear to be any binding Connecticut authority applying a "vacating or abandoning" clause in a lease. It should be noted at the outset that Konover has expressly abandoned any claim that Service has abandoned the premises; the sole issue, for the purpose of this section, is whether Service has vacated the premises. Though the parties of course differ as to the conclusion, their arguments agree on many points. There is no clause prohibiting the cessation of retail operations, and it is agreed that the mere ceasing of operations does not in itself constitute a vacatur of the premises. Konover contends that the building was substantially emptied of inventory and futures, such that the premises were vacated. Service and Trigg argue that because items of some value were left behind, a portion of the premises was still being operated as a retail store by The Casual Male, rent and other payments were being made (or at least not discontinued), the security system was still operative, and every intention was expressed to replace the premises with a new retail operator with some expedition, the premises were not vacated. Additionally, the defendants argue that because the lease, as amended in 1966, also includes a clause providing that "the lessee interest shall be at all times freely transferable" and that the tenant shall have the right to sublease any portion of the premises, the intention of the parties must have been to allow some period of transition between occupants.
The case perhaps most helpful to the defendants is In thematter of Cheshire Molding, 9 B.R. 309 (D.Conn. 1981). Judge Krechevsky, applying Connecticut law, determined that the bankrupt tenant had not vacated the premises in a situation similar to the case in issue. As reported in that opinion, the tenant had removed virtually all its equipment and inventory from the premises, which had been virtually empty for several months prior to the landlord's petition to terminate the stay so that it could repossess the premises. Under the terms of the lease, the landlord could reenter the premises if the lessee "shall vacate the premises or abandon the same." The tenant had tried to market the leasehold interest as an asset: as in this case, apparently, the leasehold interest had a greater value than the underlying lease reflected. The bankruptcy court held[6] that the tenant had not vacated the premises, because the tenant, or, more CT Page 10518 precisely, the tenant's guarantor, continued to pay rent and insurance premiums, to cut the grass and to provide for snow removal to heat the building and to preserve the alarm system. The court stated that lease provisions should generally be construed to prevent forfeitures, and also held that it would not terminate the stay in any event while negotiations to transfer the leasehold interests were pending. The Cheshire Molding court, which of course approached the issue from a generally equitable point of view, appeared to focus on the overall business situation rather than on the more narrow issue of physical vacating: it appeared from the reported facts that the tenant had virtually no presence on the premises, and that the guarantor was maintaining the building only for the purpose of assigning the lease.
Other courts have considered "vacating" to be somewhat more narrow. While abandonment necessarily implicates an intent to give up the leasehold interest; "vacating" has generally been construed to mean a more physical emptying of the building. Thus, a building can quite easily be vacated without being abandoned.[7] In Liqui-Box Corp. v. Estate of Elkman, 238 N.J. Super. 588,570 A.2d 472 (N.J. App. 1990), the lease provided that the tenant would be in default if it vacated or abandoned the premises for at least thirty days. The tenant, a manufacturer, closed the plant, removed all furniture and the premises were left in at least a mild state of disrepair. The tenant left behind some items used, apparently, in its manufacturing process, including two water towers, two "air handlers" and other equipment. The estimated value of the equipment left behind was approximately $17,000, in comparison to a value of the items before moving out estimated at over $1,000,000, but the equipment was apparently unusable. Unlike the present case, apparently some insurance premiums had not been paid and a security system had been removed; like the present case, rent was still being paid, as the tenant sought to sublease the building.
The Liqui-Box court reasoned that, unlike abandonment, vacating involved only physical processes; "to vacate", in the context of a lease, meant to deprive the premises of all goods of substantial value. Id., at 570 A.2d 477. The use of the building to store a few items would not defeat a finding of vacating, nor would the non-physical factors such as paying rent and having the intent to sublease. CT Page 10519
Consistent with Liqui-Box, and also relied on by the plaintiffs, is PRC Kentron, Inc. v. First City Center AssociatesII, 762 S.W.2d 279 (Texas App. 1988), in which the court held, at p. 282, that no intent was necessary for the physical act of "vacating." As stated by that court, a tenant with a "no vacating" clause in the lease was in default if it moved out such that property of no substantial value was left, regardless of whether it intended to return and regardless of whether it paid rent. It further held that the test of vacating was whether the emptying was "substantial", that is, a finding of vacating may not be defeated by leaving a few items of little or no value strewn about. Id. at 283.
I have read all of the cases cited by the parties on the issue of "vacating", and, though there are some irreconciliable inconsistencies in the cases, a general consensus does emerge. First, virtually all of the cases[8], many referring to dictionary definitions, hold that "vacating" is a physical act. Distinguishing "vacating" from "occupying", especially as those terms occur in the insurance context, the courts generally state that occupying refers to human habitation, while vacating refers to physical possessions. Thus, if a tenant spends three months of the year in Florida, his residence may be unoccupied but is not vacant if his belongings remain in the residence; if, on the other hand, he moves his property out, he vacates the residence. See, e.g., Myers v. Merrimack Mutual Fire Ins. Co., 788 F.2d 468,471 (7th Cir. 1986). Second, although the dictionary definitions of "vacate" frequently appear to require the removal of all objects, most of the cases indicate that the test is whether items of "substantial value" in a utilitarian sense remain. See, e.g., Knoff v. U.S.F.G., 447 S.W.2d 497 (Tex.App. 1969); Cavinv. Charter Oak Fire Ins. Co., 66 Ill. App.3d 808, 810-11,384 N.E.2d 441 (Ill.App. 1978). Finally, much of the analysis seems to be fact-driven: if, in the circumstances, there is nothing left of"substantial value", then vacating will be found.
It may be instructive to compare Myers v. Merrimack MutualFire Ins. Co., supra, with Turks Head Realty Trust v. ShearsonLehman Hutton, 736 F. Sup. 422 (D.R.I. 1990). In Turks Head, the defendant, a brokerage, stopped doing business, following a merger, in the plaintiff's building. It left behind, however, "a good deal" of electronic equipment, apparently all of the office furniture, a number of files, and for some of the time a security guard and two receptionists remained. Rent for the month in question was paid. In the circumstances of this case, it was CT Page 10520 found that the tenant did not vacate the premises during the time claimed. It seems that, analogously to the Florida hypothetical the tenant could have started up doing business again in the premises without missing a beat.
In Myers, on the other hand, there were no tenants in a building at the time in question. Only a few items, such as some more or less abandoned stoves and refrigerators, were left in the residential building. The owner had a presence in the building in the sense that he was slowly trying to renovate the building. The court held that the building was vacated even though a few items were left: it was clear that, in this situation, everyone had "moved out."[9]
I find, then, that the appropriate test to apply is whether items of "substantial value", functionally, were left on the premises at the time this action was brought. Common sense would dictate that the leaving of a few items will not defeat a finding of vacating. It will be recalled that there were no employees left at the premises, and there was no merchandise or inventory left. The items of consequence which remained were a jewelry display apparatus, some shelving, conveyor belts and some miscellaneous furniture and equipment; these, according to the plaintiff's expert, had a monetary value of roughly $29,000 or $48,000, depending on the method[10] used. Service's director of real estate, Buddy Davenport, testified that the book value of the remaining equipment was about $125,000; Floyd Dean, Service's vice president of real estate operations, testified in a deposition that the value was much greater.[11] A computer-generated list of the fixtures and equipment was admitted into evidence through Davenport, and it is clear from the list that a roughly similar number of items had been removed as had been left. Responses to interrogatories, admitted into evidence, established that in November, 1996, the book value of the inventory was about $2,800,000 and the retail sales value about $5,000,000; in May, 1997, the book value was about $1,100,000 and the retail sales value of inventory about $2,300,000. The book value of the fixtures was about $238,000 in November, 1996, $200,000 in May, 1997, and, as noted above, $125,000 after the July closing of the store. It is clear that however the monetary value of the items left behind is measured, and of course it was apparent that perhaps some of the testimony in this regard was somewhat result-oriented, it was considerably less than the value of fixtures, equipment and inventory prior to the closing of retail operations. CT Page 10521
The issue, then, is whether in the circumstances of this case the premises had been vacated such that no items of substantial value remained on the premises. Although the question is exceedingly close, I find that the plaintiffs have not sustained their burden of proof on the issue. Although items of considerable value had been removed, and it is likely from a review of the testimony that Service removed most of the items for which it had an immediate use in any of its other stores,[12] the fact remains that items of considerable value remained. Apparently more than half of the value of fixtures and equipment remained compared to the May value, and, though it was obvious the store had closed, it was not "empty". Some of the remaining items may have been useful in operating a retail business. The reported cases on the issue which find a vacating typically find a far more complete removal of property than that which happened in this case. As noted above, 2,400 feet of the premises were full and being operated by The Casual Male. This factor, combined with the not insubstantial value of the items remaining in the premises, compel a finding that the burden of proof was not sustained.
Service and Trigg raise several other arguments against a finding that Service vacated the premises. In light of the holding above, it may not be essential to consider them, but, in the event the issues should be raised again, a discussion may be useful. A temporary ceasing of operations, it is argued, is necessary if the clause allowing the premises to be "freely transferable" is to have any effect. The argument is that there is a necessary gap between occupiers of commercial premises; if the provisions of the lease are to be read as a whole so as to give effect to each clause if at all possible; see, e.g., Ingallsv. Roger Smith Hotels Corp., 143 Conn. 1, 6 (1955); then considerable latitude must be extended in interpreting the vacating clause, the reasoning goes. Although I agree in principle with the legal propositions advanced, I do not think they apply to the case at hand. First, I think that the definition of vacating, in the circumstances of this case, is unambiguous and does not require interpretation. Second, there is no necessary inconsistency between the two clauses: it takes little imagination to see that if, for example, Service had left the premises more or less intact while the arrangements with Trigg and its prospective tenant(s) were firmed up and had moved out substantially contemporaneously with the tenant's moving in, there would have been no vacancy.[13] What Service could not CT Page 10522 safely do, under the lease, was to move substantially all of its property out unilaterally.[14]
The defendants also posit that "equity abhors a forfeiture", and that terms in a lease must be construed accordingly. Equity has little role in this aspect of the case, however, and although I agree that if interpretation of contract terms were necessary the bias against forfeiture would have some weight, this case involves simply the application of definitions. Service, it should be noted, had fair warning concerning the vacating issue.
Three special defenses have been pleaded: estoppel waiver and "unclean hands." Again, I will address the issues briefly, as they may arise again. I agree with the statements of law set forth by the defendants, but their application does not favor the defendants. The defenses, though by no means identical are interrelated.
Estoppel results when a party makes a promise or a representation to another which is intended to induce the other to act and the other party does change his position in reliance on the inducement. See, e.g., Novella v. Hartford Accident Indemnity Co., 163 Conn. 552, 563 (1972); John F. Epina Realty,Inc. v. Space Realty, Inc., 194 Conn. 71, 85 (1984). The defendants in their special defense allege that the course of conduct of the Konover enterprises constituted such a representation. More specifically, they assert that the issuance of the estoppel letter on June 30, the communication of June 23 in which Michael Konover suggested that, if the other deal fails, Service may find it advantageous to deal with Konover, and conversations by Trigg with Konover agents or employees[15]
constituted such estoppel, together with underlying general knowledge by Konover that efforts were being pursued to bring in new tenant(s).
In the circumstances of this case, there can be no estoppel. Most obviously, there was no direct evidence to the effect that anyone connected with the Konover organization told any of the defendants that they did not have to worry about the vacating clause, and that, in reliance on such representation, Service vacated. Quite the contrary is true: Michael Konover, who was known by all parties to be the person with the greatest authority at Konover, not only pointed out the clause to Service with an arrow, but also consistently stressed that Konover intended to enforce the lease strictly. Although casual comments may have CT Page 10523 been made by Konover employees to Trigg to the effect that he had "won" the negotiations, there was nothing to suggest that Konover would not enforce the provisions of the lease should the occasion arise. The estoppel letter on its face refers to events that have occurred in the past: there is no reliable way that an estoppel letter can refer to incidents which conceivably could occur in the future. The thrust of Konover's position, which appears to be consistent, is that it first tried to obtain the lease by negotiation, but then recognized that Trigg was willing to pay a higher price than it was willing to pay. Even so, it was still interested in negotiating should the Trigg deal fall through. Meanwhile, it was insisting on strict compliance with the terms of the lease. There was no objective reason for either of the defendants to believe that Konover would not enforce the lease, and no objective reason for them to change any plans on such a belief.
The position as to waiver is very similar. Waiver is the intentional relinquishment of a known right. Majernicek v.Hartford Casualty Insurance Co., 240 Conn. 86, 97 (1997). There can be no waiver unless the party who is claimed to have waived a right has both the knowledge of the right and the intention to relinquish it. Farmers Mechanics Bank v. Kneller,40 Conn. App. 115, 125 (1996). Waiver may be express or implied from the circumstances. Wadia Enterprises v. Hirschfeld, 224 Conn. 240,251 (1992). The party seeking to assert the waiver must show that it has been prejudiced thereby. Advest v. Wachtel, 235 Conn. 559,569 (1995). Waiver is an act of understanding that presupposes that a party has knowledge of its rights, but chooses not to assert there Fisette v. DiPietro, 28 Conn. App. 379, 385 (1992).
No extended discussion is necessary with respect to the waiver issue. Not only is there no evidence that Konover waived its rights as to the vacating clause, but there is no evidence that Konover knew of its rights under the clause until July 11, 1997. In light of its consistent position regarding enforcing the lease, and its lack of knowledge of facts suggesting a vacating until very shortly before bringing this action, there can be no waiver.
Finally, Trigg has alleged "unclean hands" on the part of Konover. In light of the foregoing discussion, and the course of conduct of the parties, no further discussion of this issue is required.[16]
CT Page 10524
Judgment may enter for the defendants.
Beach, J.