# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CATAWBA ASSOCIATES –
CHRISTIANA LLC,

        Plaintiff,

        v.

PARTHIBAN JAYARAMAN,
PRADIP C. SAHA, and PUSAN
RE NEWARK, LLC,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. N16C-01-250 PRW

Submitted: August 3, 2016
Decided:  August 26, 2016

## MEMORANDUM OPINION AND ORDER

*Upon Plaintiff, Catawba Associates – Christiana LLC's,*
*Motion for Judgment on the Pleadings,*
**DENIED**.

Somers S. Price, Jr., Esquire, Potter Anderson & Corroon LLP, Attorney for Plaintiff, Catawba Associates – Christiana LLC.

Gary R. Dodge, Esquire, Curley, Dodge, & Funk LLC, Attorney for Defendants, Parthiban Jayaraman, Pradip C. Saha, and Pusan RE Newark, LLC.

**WALLACE, J.**

## I.   INTRODUCTION

This case arises from an ill-fated real estate negotiation between Plaintiff, Catawba Associates – Christiana LLC ("Catawba") and Defendants, Parthiban Jayaraman and Pradip C. Saha, and Pusan RE Newark, LLC (collectively "Pusan"), for the sale of property located at 425 Stanton Christiana Road, Newark, Delaware (the "Property"). As stated in the Agreement of Sale agreed to and executed between the parties, Catawba was obligated to deliver the Property "vacant and not subject to any possessory or leasehold rights."[1] Catawba placed $100,000 in escrow, returnable upon completion of that obligation; if Catawba failed, the funds were payable to Pusan.

On December 11, 2015, when taking possession of the property, Saha discovered that Catawba had failed to remove items leftover from the Property's prior tenant; thus, Pusan alleges that Catawba failed to deliver a "vacant" Property as agreed. Catawaba objects, arguing that it had no obligation to remove those items and did successfully deliver the Property "vacant."

On January 29, 2016, Catawba filed an action for declaratory judgment. It seeks a declaration that it is entitled to return of the $100,000 escrow funds and an award of attorney's fees. Pusan filed a counterclaim seeking the same relief.

---

[1]    Agreement of Sale at ¶ 5(a), attached as Ex. A to Plf.'s Action.

The Court is now called upon to determine, first, the meaning of the word "vacant" as used and understood by the parties in the Agreement of Sale, and, second, whether the Property was in fact delivered "vacant."

For the reasons set forth below, Catawba's Motion is **DENIED**; Pusan's counterclaim is likewise **DENIED**.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

To realize the Property's sale, Catawba and Pusan executed three documents: the Agreement of Sale; the Lease Assignment; and the Lease Termination Agreement.

### A.   THE AGREEMENT OF SALE

On May 18, 2015, Catawba, Jayaraman, and Saha executed an Agreement of Sale whereby Catawba sold the Property to Jayaraman and Saha for $1.6 million.[2]

Central to this action is Section 5 of the Agreement of Sale which concerned an existing lease for the Property to the then-tenant, Grayling Corporation, Inc. ("Grayling").[3] Section 5 required Catawba to remove Grayling within seventy-five days after closing (the "Tenant Removal Period").[4] Specifically, the clause required Catawba to "remove [Grayling] pursuant to the Lease, in order to deliver possession of the Property to [Jayaraman and Saha] vacant and not subject to any

---

[2]     See Plf.'s Action at ¶ 2; Agreement of Sale at ¶¶ 1-2.

[3]     Grayling operated a Chili's Grill & Bar Restaurant at the Property.

[4]     Agreement of Sale at ¶ 5.

-3-

possessory or leasehold rights of [Grayling]."[5] Closing on the Property occurred on October 9, 2015; so, Catawba was required to remove Grayling prior to December 23, 2015.

To ensure Catawba would fulfill its obligation, Catawba was required to deposit $100,000 into an escrow account.[6] Once Catawba certified Grayling's successful removal and that the Property was vacant, Catawba was entitled to receive the money back.[7] But if Catawba failed to do so, Jayaraman and Saha would receive the escrow funds.[8]

The Agreement of Sale provided that the Property was sold "including all improvements located thereon – 'Building and Land – AS-IS, WHERE-IS, WITH ALL FAULTS.'"[9] Jayaraman and Saha were given a 120-day "Due Diligence Period" to inspect the property. If they were unsatisfied "for any reason whatsoever," they had the option of terminating the sale and receiving their deposit

---

[5]      Id. at ¶ 5(a).

[6]      *Id.*

[7]      *Id.* ¶ 5(a)-(b).

[8]      *Id.*

[9]      *Id.* ¶ 6(a).

back.[10]  But they claim that they were unable to inspect the property because Grayling continued to operate its restaurant business.[11]

Also relevant here is Section 27.  That provides for attorney's fees in the event that either party seeks to enforce or interpret the rights or obligations provided under the Agreement of Sale.[12]  The prevailing party is "entitled to all reasonable expenses incurred as a result of such action, including but not limited to, reasonable attorneys' fees, expert fees, professional fees and related costs and expenses."[13]

## B.   THE ASSIGNMENT OF THE LEASE

On October 9, 2015, Jayaraman and Saha assigned the Agreement of Sale to Pusan.[14]  The same day, Catawba assigned its lease with Grayling to Pusan.[15]  The Assignment of Lease required that Pusan indemnify Catawba for all liens, demands, and causes of action under the lease.[16]  Additionally, Section 8 stated that

---

[10]     *Id.*

[11]     Defs.' Mem. in Resp. to Plf.'s Action ("Def.'s Resp.") 5 ("Grayling was actively operating a restaurant prior to that date, and any attempt to investigate the structure of the Property would have required Grayling to cease its operations and remove its equipment from against the wall – an unreasonable proposition.").

[12]     Agreement of Sale at ¶ 27.

[13]     *Id.*

[14]     *See* Assignment of Agreement of Sale, attached as Ex. B to Plf.'s Action.

[15]     *See* Assignment of Lease, attached as Ex. C to Plf.'s Action.

[16]     *Id.* at ¶ 5.

Catawba "shall not be responsible to [Grayling] under the Lease for the discharge and performance of any and all duties and obligations to be performed and/or discharged by the Landlord" and that Pusan "assumed and agrees to perform all of the terms warranties, covenants, and conditions of the Leases on the part of the Landlord . . ."[17]

## C.   THE LEASE TERMINATION AGREEMENT

On October 14, 2015, Pusan entered into a Lease Termination Agreement with Grayling and Catawba whereby Grayling was required to vacate the Property by December 13, 2015. The lease would then terminate.[18]

Section b(2) of the Lease Termination Agreement provided that after the termination date the parties would have no further rights under the lease, stating:

> . . . the parties hereto mutually release and fully discharge each other from all claims . . . or liabilities of any kind and nature . . . based on . . . the negotiation, execution, performance, termination, and/or release of the Lease, both as to all matters and things now known or unknown, and also to all matters and things which may have been discovered.[19]

---

[17]   *Id.* at ¶ 8.

[18]   *See* Lease Termination Agreement ¶ 1 ("Effective on the earlier to occur of the date that Tenant vacates the Property in accordance with the terms of the Lease or sixty (60) days after the date of this Agreement . . . , the Lease and all respective rights . . . are hereby mutually terminated . . ."), attached as Ex. D to Plf.'s Action.

[19]   *Id.* ¶ 2.

Section (b)(3) provided that:

> [The Lease Termination Agreement] would supersede all other written or oral agreements between the parties relating to the Lease and shall extinguish any rights, liabilities or obligations which under the Terms of the Lease or by law survive the termination of the Lease.[20]

## D.   ALLEGED BREACH OF AGREEMENT

Grayling ceased operations of its restaurant business on December 6, 2015.[21] On December 11, 2015, Saha performed a walk-through of the Property with a Grayling representative. Saha found a significant amount of Grayling's property (primarily leftover kitchen and restaurant equipment) within the Property as well as a "significant mold problem."[22]

On December 15, 2015, Catawba sent written notice to the escrow agent that the Property was vacant and that Grayling was no longer a tenant. Catawba demanded return of the escrowed $100,000.

Pusan objected to the release of the escrow funds the next day, citing the remaining Grayling property and an alleged mold problem.[23] Through counsel, Pusan requested fourteen items be removed from the Property, including: a walk-in

---

[20]    *Id.* ¶ 3.

[21]    Plf.'s Mot. for J. on the Pleadings 5.

[22]    Defs.' Ans. and Counter-Claim at ¶¶ 26, 29.

[23]    *Id.* ¶ 29; Email from Gary R. Dodge, Defendants' counsel, to Stacy Stine, Catawaba's representative (December 16, 2015), attached as Ex. A to Defs.' Counter-Claim.

-7-

freezer/cooler; outside shed; ice-cuber; two kitchen hoods; steel tables; dish washing tables; bar cabinets; bar sinks; bar and kitchen coolers; office furniture; beer tower/lines; beverage prep tables; beverage racks/lines; and the building's awning.[24] Pusan claimed that possession was not tendered as directed under the Agreement of Sale's terms, specifically Section 5's requirement that the Property be delivered "vacant and not subject to any possessory interest or leasehold rights" by Grayling.[25] Absent the items' removal, Pusan refused to accept.

Catawba refused to remove either the leftover items or mold, arguing that it had satisfied all of its contractual obligations.

On January 29, 2016, Catawba filed its action for declaratory judgment in this Court against Pusan, seeking the $100,000 in escrow funds and attorney's fees. Pusan's Answer was filed on March 9, 2016; it asserts a counterclaim for the same relief.

### E. JUSTICE OF THE PEACE ACTION

Nearly parallel to this action, Pusan filed an action for summary possession in the Justice of the Peace Court ("JP Court") against Grayling. Pusan sought full possession of the Property and prorated rent. It argued that because Grayling had left items behind, Grayling had failed to surrender the property in accordance with

---

[24] *Id.*

[25] Defs.' Resp. 6; Counter-Claim ¶¶ 31-32.

the lease's provision that "upon termination of the lease term, the tenant shall quit and surrender the demised premises and all buildings and improvements thereon, in good condition and repair, except for reasonable wear and tear."[26]

On May 23, 2016, a trial was held on Pusan's claim. After Grayling moved for directed verdict, the JP Court held that the Property had been surrendered and that Pusan received legal possession as of December 11, 2015.[27] Pusan was able to take possession of the Property, remove the offending leftover items, and make significant renovations to the property.[28] Grayling's items, the JP Court said, were unwanted "trash" and not a reflection of its failure to surrender the Property.[29]

Pusan appealed. Grayling filed a motion to dismiss, asserting that Section (b)(2) of the Termination Agreement extinguished all legal remedies between the parties. The Court agreed and granted Grayling's motion to dismiss, holding that the Agreement clearly precluded "either party from bringing legal

---

[26] Order, *Pusan RE Newark, LLC v. Grayling Corp.*, No. JP13-16-004033, 1-2 (Del. J.P. May 25, 2015).

[27] *Id.*

[28] *Id.*

[29] *Id.*

actions or claims for any reason whatsoever associated with the termination of the lease."[30]

The parties agree that this Court may take judicial notice of both JP Court decisions.[31]

## III. PARTIES' CONTENTIONS

Both Catawba and Pusan seem to agree that the question before the Court now is whether the Property was delivered "vacant" in accordance with Section 5's requirement that the Property be delivered "vacant and not subject to any possessory interest or leasehold rights" of Grayling. The JP Court has resolved whether the Property was subject to a possessory interest, finding that the Property was delivered to Pusan on December 11, 2015 free of any possessory or leasehold rights. Yet the parties contest whether the Property was "vacant" when delivered.

"Vacant" is not defined in the Agreement of Sale.

Pusan argues that where a contract term is not defined, a Delaware court should adopt the plain dictionary meaning.[32] Citing Black's Law Dictionary and

---

[30] Order on Trial De Novo, *Pusan RE Newark, LLC v. Grayling Corp.*, No. JP13-16-004033, 1-2 (Del. J.P. July 18, 2016).

[31] Letter from Pusan to the Court (July 12, 2016) ("The Defendant concedes that the Court is entitled to take judicial notice of that disposition, and, furthermore, that the decision is binding upon the Defendant as to the issue of whether it was in legal possession of the subject property on or around December 11, 2015.").

[32] *Id.* (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006)).

-10-

Merriam Webster, Pusan would define "vacant" as "a state of being empty and devoid of contents."[33]

It also suggests a number of cases that define "vacant" as lacking items of substantial value.[34] Pusan asserts that the leftover items were functional and had substantial value – but it does nothing quantify that amount or value. Instead, it implies that value is inferred because Grayling attempted to sell to Pusan those remaining items. So, says Pusan, because the Property contained Grayling's leftover valuable items, it was not empty, and thus was not vacant.[35]

In response, Catawba argues that even under Pusan's definition – which Catawba argues is inapplicable – the Property was clearly vacant. The leftover items had little to no value; in the words of the JP Court, they were "trash."[36]

Catawba maintains that the meaning of "vacant" must be construed in the context of all the parties' documents. Under the parties' agreements, neither Catawba nor Grayling had an obligation to remove Grayling's items from the Property.

---

[33]    *Id.*

[34]    *Id.* (citing, *e.g.*, *Bishop's Corner Associates Ltd. P'ship v. Serv. Merch. Co.*, 720 A.2d 531 (Conn. Super. Ct. 1997), *aff'd*, 718 A.2d 966 (Conn. 1998); *Liqui-Box Corp. v. Estate of Elkman*, 570 A.2d 472 (N.J. Super. Ct. App. Div. 1990); *Foureal Co. v. Nat'l Molding Corp.*, 344 N.Y.S.2d 598 (N.Y. Dist. Ct. 1973)).

[35]    *Id.*

[36]    Letter from Catawba to the Court (July 15, 2016) (distinguishing cases cited by Pusan).

First, Grayling had no obligation to remove items from the Property under its lease's terms. Grayling was only required to "quit and surrender the Demised Premises and all buildings and improvements thereon, in good condition and repair, except for reasonable wear and tear."[37] Catawba argues that this provision did not require Grayling to remove leftover items outside its general obligation to leave the property in "good condition."

Second, Section 2 of the Lease Termination Agreement released Catawba and Grayling from all claims related to the tenancy. The section effectively severed Catawba's legal right to force Grayling to remove its items. Because Catawba could not remove the leftover items or force Grayling to do so, Catawba cannot be liable for them. Moreover, Section 3 of the Lease Termination Agreement extinguished all rights or liabilities between the parties relating to the Lease.

## IV. STANDARD OF REVIEW

Similar to a motion to dismiss, a party is entitled to judgment on the pleadings when there is no material fact in dispute and the moving party is entitled to judgment under the law.[38] "A court should not grant such a motion unless it

---

[37] *Id.* at 2-3; Grayling Ground Lease at ¶ 30, attached as Ex. 1 to Plf.'s Action.

[38] *Silver Lake Office Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 WL 595378, at *6 (Del. Super. Ct. Jan. 17, 2014); *City of Harrington v. Delaware State Fair, Inc.*, 2015 WL 4464899, at *2 (Del. Super. Ct. June 22, 2015) ("The procedural standard of review for a motion for judgment on the pleadings under Rule 12(c) is similar to that for a motion to dismiss under rule

-12-

appears to a reasonable certainty that the non-movant would not be entitled to relief for its claims under any set of facts that could be proven in support of its allegations."[39]

In reviewing the motion, the Court must accept all the "complaint's well-pled facts as true and construe all reasonable inferences in favor of the non-moving party."[40] The Court may consider exhibits and documents incorporated by reference into the complaint.[41] Here the Court will consider: the Agreement of Sale; the Assignment of the Agreement of Sale; the Lease Assignment; and the Lease Termination Agreement.

## V. DISCUSSION

The Court is called upon to interpret the term "vacant" as used in the Agreement of Sale and determine whether the Property was in fact "vacant" before expiration of the Tenant Removal Period (December 23, 2015). The interpretation

---

12(b)(6)."); *Velocity Exp., Inc. v. Office Depot, Inc.*, 2009 WL 406807, at *3 (Del. Super. Ct. Feb. 4, 2009); *Potomac Ins. Co. of Illinois v. Corp. Interiors of Delaware, Inc.*, 2001 WL 1474813, at *2 (Del. Super. Ct. Nov. 1, 2001), *aff'd*, 808 A.2d 1204 (Del. 2002). *See also* Del. Super. Ct. Civ. R. 12 ("After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings.").

[39] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 n. 7 (Del. 1993) (quoting lower court's decision); *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 965 (Del. Ch.), *aff'd*, 567 A.2d 419 (Del. 1989).

[40] *Silver Lake*, 2014 WL 595378, at *6.

[41] *Schwan's Home Serv., Inc. v. Microwave Sci., JV, LLC*, 2013 WL 3350881, at *4 (Del. Super. Ct. June 24, 2013).

-13-

of "vacant" is a question of law, but the application of that term to the Property is a question of fact.[42]

For the reasons discussed below, the Court finds that "vacant" as used in the Agreement of Sale is unambiguous, but that a question of fact remains as to whether the Property was in fact rendered vacant.

### A.   INTERPRETATION OF "VACANT"

The Court's first task is to determine whether "vacant" as used in the Agreement of Sale is ambiguous.[43]

"In deciding a contract interpretation dispute, the court will first 'examine the entire agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous.'"[44] "If the relevant contract language is clear and unambiguous, courts must give the

---

[42]    *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) ("The proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law.") (quotation omitted); *Westwood Dev. Partners, LLC v. Draper*, 2012 WL 1415456, at *3 (Del. Super. Ct. Mar. 29, 2012) (contract presented question of law as to its interpretation and question of fact as to application of that interpretation).

[43]    *Lillis v. AT & T Corp.*, 904 A.2d 325, 330 (Del. Ch. 2006) ("What the court must do to resolve this case, therefore, is to decide whether the contract at issue is in any way ambiguous. . . If the contract's meaning is unambiguous, the court must grant judgment on the pleadings in favor of the moving party.").

[44]    *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *9 (Del. Ch. June 30, 2004) (quoting *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003)). *See also Lillis*, 904 A.2d at 330 ("What the court must do to resolve this case, therefore, is to decide whether the contract at issue is in any way ambiguous . . . If the contract's meaning is unambiguous, the court must grant judgment on the pleadings in favor of the moving party.").

-14-

language its plain meaning."[45] To determine whether the contract is unambiguous, Delaware "adheres to the objective theory of contracts."[46] That requires a court to interpret a particular contractual term to mean "what a reasonable person in the position of the parties would have thought it meant."[47] The parties' disagreement as to the meaning of the contract does not render it unambiguous.[48] "Rather, contracts are ambiguous when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[49]

The parties don't seem to disagree much on the definition of "vacant;" they do disagree as to the extent of the Property's emptiness before it can be deemed "vacant." Pusan would have "vacant" mean perfectly or completely empty; Catawba would have it mean substantially or mostly empty.

---

[45]    *Westfield Ins. Grp. v. J.P.'s Wharf, Ltd.*, 859 A.2d 74, 76 (Del. 2004); *Interactive Corp.*, 2004 WL 1572932, at *9 ("If the contract is clear on its face, the court will rely solely on the clear, literal meaning of those words.").

[46]    *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[47]    *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

[48]    *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) (internal citations omitted). *See also Nw. Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996); *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[49]    *United Rentals*, 937 A.2d at 830.

The Agreement of Sale does not define "vacant." And a search of Delaware law does not unearth a satisfactorily cogent definition. But "[a] term is not ambiguous simply because it is not defined."[50]

Pusan cites a few foreign cases that have interpreted "vacant" to mean "deprived of contents of 'substantial' value" and would seemingly have the Court adopt that definition.[51] In those cases, the issue centered on the interpretation of "vacate" as used in a tenancy lease's "vacate or abandon" clause. Such clauses give the landlord the right to terminate a lease where the tenant had vacated or abandoned the premises after a specified time.[52]

For example, in *Liqui-Box Corporation v. Estate of Elkman*, a tenant's commercial lease stated that if the tenant "vacated or abandoned" the building for at least thirty days, he would be in default of the lease and the landlord could reenter and repossess the building.[53] The tenant closed his business and entered into negotiations with the landlord to terminate the lease.[54] The tenant sought

---

[50]    *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 468 n. 86 (Del. Ch. 2008) (citations omitted); *ClubCorp, Inc. v. Pinehurst, LLC*, 2011 WL 5554944, at *13 (Del. Ch. Nov. 15, 2011).

[51]    *See, e.g., Bishop's Corner Associates Ltd. P'ship v. Serv. Merch. Co.*, 720 A.2d 531 (Conn. Super. Ct. 1997), *aff'd*, 718 A.2d 966 (Conn. 1998); *Liqui-Box Corp. v. Estate of Elkman*, 570 A.2d 472 (N.J. Super. Ct. App. Div. 1990).

[52]    *See, e.g., Bishop's Corner*, 720 A.2d 531, 533.

[53]    *See Liqui-Box Corp. v. Estate of Elkman*, 570 A.2d 472, 474 (N.J. App. Div. 1990).

[54]    *Id.*

compensation for ending the lease early or in the alternative to sublet the premises.[55] Upon learning that the property had become vacant, the landlord immediately sought possession of the property due to the tenant's alleged lease violation.[56]

The tenant had left behind equipment with an estimated worth of approximately $17,000.[57] Prior to the business's closure, the equipment had been worth approximately $1,000,000, but it had been stripped down and become rusted, and was thus practically unusable.[58]

The New Jersey court there reasoned that "vacate" in this particular context meant "deprived of contents of 'substantial' value."[59] Evidence submitted at trial demonstrated that the tenant "completely moved out and left behind only that equipment which it had no intention of using or which was not usable."[60] Moreover, the "employees were all laid off, operations were shut down, utilities

---

[55]    *Id.*

[56]    *Id.* at 475.

[57]    *Id.* (leftover items included two water towers, two air handlers, an air curtain, five chillers, a pit pump, and some piping and duct work).

[58]    *Id.*

[59]    *Id.* at 477.

[60]    *Id.*

were no longer needed and the building was left unsecured."[61]  Based on these facts, the court found that the tenant had vacated the building.

A Connecticut court in *Bishop's Corner* applied the same "substantial value" test, but came to a different result.[62]  A commercial landlord sought declaratory judgment that the lessee violated a similar "vacate or abandon" lease provision.[63] The lessee discontinued its business on the premises, but allowed its sublessor to continue operating as a retail store.[64]  The lessee had left a number of items behind.[65]

The *Bishop's Corner* court refused to find that the lessee had "vacated" the building in a sufficient manner to allow the landlord to effectively terminate the lease.[66]  Although finding the question "exceedingly close," the court found that because the value of the remaining equipment amounted to nearly half the value

---

[61]     *Id.*

[62]     *Bishop's Corner Associates Ltd. P'ship v. Serv. Merch. Co.*, 720 A.2d 531, 533 (Conn. Super. Ct. 1997), *aff'd*, 718 A.2d 966 (Conn. 1998).

[63]     *Id.* at 533.

[64]     *Id.* at 534.

[65]     *Id.* (items included: on the first floor: a jewelry display, some shelving, some of which was disassembled, and other miscellaneous items; in the basement: metal shelving on which inventory had been placed, two conveyor belts designed to move merchandise between floors; and some desks and chairs).

[66]     *Id.* at 537-38.

before the lessee left the building, the building was not vacant.[67] The court also found it telling that the building was still operated by a sublessor retail business.[68]

The Court is not persuaded that these interpretations of "vacant" are as helpful as Pusan would like. The effect of a "vacate or abandon clause" is substantially different from that of the provision at play here. In *Liqui-Box* and *Bishop's Corner*, the courts were called upon to interpret whether the tenants had vacated the property in order to determine whether they were in default of their lease – *i.e.* to determine whether the landlord could possess the property. Possession was the end goal for all parties and vacancy was solely relevant to determine who maintained possession. In crafting their definitions of "vacant" the *Liqui-Box* and *Bishop's Corner* courts were far more concerned about the potential loss of property rights. But that higher test created would not be appropriate for the purpose here.

So the Court finds the definition and analysis provided by *Liqui-Box* and *Bishop's Corner* informative, but not dispositive. The cases are not sufficiently analogous. Here, possession is not the goal. If vacancy was only relevant to determine possession, then the JP Court's decision would have already resolved that issue and the Court would inquire no further. But not so here. The Court

---

[67]    *Id.*

[68]    *Id.*

declines to read such a specific definition of "vacant" into the parties' Agreement, especially given the limited application of that definition across jurisdictions. Most importantly, the parties themselves did not include this "limited" definition.[69]

Besides, the Court finds that "vacant" can be understood as it is plainly and ordinarily used. Where a contract's term is not defined, Delaware courts routinely "look to dictionaries for assistance in determining the plain meaning of terms."[70]

Black's Law Dictionary defines "vacant" as generally meaning "empty; unoccupied; [d]eprived of contents . . . It implies abandonment, nonoccupancy for any purpose."[71] Webster's Encyclopedic Unabridged Dictionary defines "vacant" as "having no contents; empty" and, with regard to law specifically, as "having no tenant and devoid of furniture, fixtures, etc."[72] Similarly, Roget's Thesaurus

---

[69] *Lorillard Tobacco Co. v. Am. Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006) ("When the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented . . .").

[70] *Id.* at 738 (Del. 2006) (using dictionary definitions to determine meaning of "personal attack" and "vilification" in parties' agreement); *Evraz Claymont Steel, Inc. v. Harleysville Mut. Ins. Co.*, 2011 WL 6000780, at *4 n. 31 (Del. Super. Ct. Nov. 30, 2011) (defining "liability" as used in an insurance policy in line with its dictionary definition); *McGinnis Commercial Real Estate Co. v. Jankes*, 2016 WL 1221427, at *2 (Del. Com. Pl. Mar. 29, 2016) (using dictionary to define "maintenance" as used in lease).

[71] BLACK'S LAW DICTIONARY 1388 (9th Ed. 2009). As used in fire insurance policies, Black's distinguishes "vacant" – meaning empty – from "unoccupied" – meaning lack of habitual presence of human beings. *Id.*

[72] WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY 2100 (1996).

-20-

provides synonyms of "containing nothing," "not occupied or put to use," "lacking value, use, or substance."[73]

The Court need not find that the property was completely empty. A number of courts – albeit in different contexts not including sale agreements – have held that a property may still be considered vacant if *some* items are left behind.[74] In short, a property may be found vacant, despite the presence of some items, as long as the property is reasonably empty. And here the Court notes that the Agreement of Sale stated that the Property was to be delivered "as-is," including all improvements and all faults. Hence, the parties here must have considered that at least some items could be left behind and within the Property.[75]

---

[73] ROGET'S II: THE NEW THESAURUS 1084 (1988).

[74] *See, e.g., Liqui-Box Corp. v. Estate of Elkman*, 570 A.2d 472, 477 (N.J. App. Div. 1990) ("the use of a building, formerly used for other purposes, to store a few articles cannot defeat a claim of vacancy . . . nor can the mere presence of several minimal items left behind"); *Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 472 (7th Cir. 1986) (noting that the presence of minimal items did not prevent the court from concluding that the building was vacant); *Dunton v. Connecticut Fire Ins. Co.*, 371 F.2d 329, 330 (7th Cir. 1967) (explaining that "[i]t is well settled that the use of a building to store a few articles" did not refute vacancy); *Drutman Realty Co. P'ship v. Jindo Corp.*, 865 F. Supp. 1093, 1103 (S.D.N.Y. 1994) ("The mere presence of several minimal items left behind is insufficient to avoid a finding that the premises are vacated.") (inner quotations omitted); 6A COUCH ON INS. (3d ed. 2016) § 94:132 ("For property to be considered vacant, it need not be totally free of any fixtures and furnishings; it is enough if the state of the structure's interior, combined with surrounding circumstances, indicate that the premises are not being used in any regular manner.").

[75] Agreement of Sale at ¶ 6(a) (specifically disclaiming any representations concerning improvements on the Property).

The Court finds that the term "vacant" as used in Section 5 of the Agreement of Sale is clear and unambiguous and will be used in accordance with its ordinary meaning.

## B. APPLICATION OF "VACANT" TO THE PROPERTY

In applying the plain meaning of "vacant," the Court finds that, although this is an extremely close case, a question of fact remains as to whether the Property was indeed vacant.

Pusan identified fourteen items it wanted removed from the Property: a walk-in freezer/cooler; outside shed; ice-cuber; two kitchen hoods; steel tables; dish washing tables; bar cabinets; bar sinks; bar and kitchen coolers; office furniture; beer tower/lines; beverage prep tables; beverage racks/lines; and the building's awning.[76]

Even engaging *Liqui-Box's* and *Bishop's Corner's* "substantial value" test, the Court is highly doubtful that the leftover items' value would come anywhere close to "substantial" given the parties' ease with abandoning them. The JP Court determined that these items constituted "trash." Pusan conceded at oral argument that it was able to simply remove them from the Property. And, as also admitted at oral argument, Pusan does not know where these items are now located. This leads

---

[76] Email from Gary R. Dodge, Defendants' counsel, to Stacy Stine, Catawaba's representative (December 16, 2015), attached as Ex. A to Defs.' Counter-Claim.

the Court to conclude that the items were not valuable enough to secure and were easy enough to lose.

But the pleadings lack any specificity as to the extent, size, condition, location, or value of any of the leftover items. The Court cannot determine, for example, whether the leftover "office furniture" was one beat-up chair or twenty almost-new ones. The Pleadings lack any documentary evidence, such as photographs, detailing what condition the Property was left. Without more specifics, the Court cannot yet determine factually whether the Property was vacant despite the presence of a few items; or was, in fact, not vacant because of the presence of numerous and/or large pieces of equipment. This absence of evidence creates a question of material fact as to whether the Property was vacant when possession was delivered to Pusan on December 11, 2015.

## VI.    CONCLUSION

Accordingly, for the reasons stated above, both Catawba's Motion for Judgment on the Pleadings and Pusan's indistinguishable counterclaim are **DENIED**.

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge